(848 P.2d 1000)

No. 67,700

LAVERNE MARTIN, *Appellee* , v. BOARD OF COUNTY COMMISSION-
ERS OF JOHNSON COUNTY, KANSAS, sitting as the Governing
Body of the Johnson County Unified Wastewater Districts,
*Appellant.* ·

Opinion filed March 19, 1993.

*LeeAnne Hays Gillaspie*, of the Johnson County Legal Department, of Olathe, for the appellant.

*David W. Boal*, of Kansas City, for the appellee.

Before BRISCOE, C.J., ELLIOTT, J., and TERRY L. BULLOCK, District Judge, assigned.

BRISCOE, C.J.: This is a personal injury action brought by Laverne Martin against the Board of County Commissioners of Johnson County (Board), sitting as the governing body of the Johnson County Unified Wastewater Districts (District). After trial to a jury, a verdict was returned in favor of Martin in the amount of $283,764. The Board contends Martin's suit was barred by the

statute of limitations. The Board also contends the trial court erred in admitting testimony by Martin's expert witness, in submitting the case to the jury on the theory of res ipsa loquitur, and in denying the Board's motion for new trial.

On May 22, 1987, Martin was trimming a bush in her back yard while sitting on a manhole cover. The manhole collapsed, sending the cover, frame, and Martin into the manhole. Martin injured her right arm and the heel of her right foot in the fall. Because of her injuries, she was unable to climb out by using the rungs built into the wall of the manhole. Her only option was to stand on one leg and call for help. She was discovered approximately one-half hour later. According to Martin, although there was little or no sewage in the manhole when she fell, she shared the hole with a snake. She also was worried that she would not be rescued in time to take her heart medication.

After Martin was extricated from the manhole, she was admitted to the University of Kansas Medical Center, where she remained a patient for seven days. Martin suffered a fragmented fracture of her upper right arm and a fragmented fracture of her right heel bone. Her hip also apparently caused her pain. A cast was placed on Martin's right leg and her right arm was immobilized. Upon her release from the hospital, she recuperated at Delmar Gardens Nursing Center for approximately 40 days. During this period, she used a special wheelchair, had to be bathed and dressed, and, she alleges, was treated as though she were senile. When she returned home, Martin required the assistance of a visiting nurse for a period of several weeks. She received treatment for her ankle and hip into the fall of 1989.

Martin had numerous preexisting health problems, including heart problems dating back to 1975 when she had suffered a heart attack. In 1986, she suffered frequent episodes of chest pain. After undergoing cardiac catheterization and an unsuccessful angioplasty, she suffered a second heart attack in December 1986. After her second heart attack, Martin stopped working and began receiving disability benefits.

Martin also suffers from hypertension and has had a weight problem for many years. Her chronically dislocated right shoulder was surgically repaired in 1969. Martin stated she had limited mobility of her right shoulder or arm prior to the accident, but

that it worsened after the accident. Dr. Harry Overesch, Martin's medical expert, testified that she had preexisting arthritis in her right shoulder and that it would have probably progressed to some degree regardless of the fracture that resulted from the accident. Martin continues to have limited use of her shoulder and has difficulty walking as a result of her injuries. She has pain in her right heel and right shoulder and sometimes is required to use a cane to walk. Dr. Overesch acknowledged that Martin's weight may aggravate the discomfort. Martin continues to experience pain if a lot of pressure is applied to her right hip.

Martin's house and the manhole in her yard were built in the early 1950's, and Martin has lived in the house since it was built. As was typical, the manhole was built by a company hired by the landowner/developer. After construction of a sewer system, the system is examined and, if requirements are met, the District assumes control of the system. The Board governs the District, which is a collection of over 850 separately created wastewater districts. There are approximately 1,200 miles of sewer line within the District, access to which is provided by over 25,000 manholes, including the one found in Martin's back yard. The District is responsible for the upkeep and maintenance of the manholes.

To address numerous sewage backup problems which occurred in the spring of 1983, the District hired RJN Environmental Associates (RJN) to conduct an evaluation of the system to determine the source of infiltration and inflow of ground water and storm water into the sewer system. In November 1985, as a part of this district-wide evaluation, RJN inspected the manhole in Martin's yard. An employee of RJN, David Johnson, noted his inspection of the brick portion of the manhole that supported the frame and lid on top of the manhole revealed deterioration. However, Johnson testified that, if he had observed the manhole to be in a condition that would threaten his safety, he would have noted the condition on the inspection form and would not have entered the manhole. He stated his inspection included his standing on top of the manhole with a foot on either side of the cover and that he weighed approximately 230 pounds at the time of the inspection. There was testimony the RJN inspections revealed a large percentage of the manholes in Martin's district had de-

terioration similar to that noted on the inspection form for the manhole in her yard.

Martin brought suit against the Board for damages, including pain and suffering, medical expenses, and lost wages. During the course of the trial, the trial court granted a motion for limited directed verdict for medical expenses and also granted a directed verdict motion against Martin on her claim for lost wages. The jury returned a verdict in Martin's favor in the amount of $283,764, including $100,000 for pain and suffering.

I. Statute of Limitations.

The Board contends the trial court erred in interpreting K.S.A. 12-105b(d), and therefore erred in allowing Martin to file her action after the statute of limitations had expired. The Board filed a motion to dismiss the action as untimely, and that motion was denied.

The interpretation of 12-105b(d) presents an issue of first impression in the Kansas appellate courts. Interpretation of a statute is a question of law, and, therefore, this court is not bound by the decision of the trial court. See *Todd v. Kelly,* 251 Kan. 512, 515, 837 P.2d 381 (1992); *Memorial Hospital Ass'n, Inc. v. Knutson,* 239 Kan. 663, 668, 722 P.2d 1093 (1986).

K.S.A. 12-105b(d) became effective on July 1, 1987. *Stevenson v. Topeka City Council,* 245 Kan. 425, Syl. ¶ 2, 781 P.2d 689 (1989), held this provision is procedural and should be given retrospective application unless vested rights of a party are affected. Here, the parties do not dispute that this provision applies to Martin's claim which arose on May 22, 1987.

K.S.A. 12-105b(d) states:

"Any person having a claim against a municipality which could give rise to an action brought under the Kansas tort claims act shall file a written notice . . . before commencing such action. . . . Once notice of the claim is filed, no action shall be commenced until after the claimant has received notice from the municipality that it has denied the claim or until after 120 days has passed following the filing of the notice of the claim, whichever occurs first. A claim is deemed denied if the municipality fails to approve the claim in its entirety within 120 days unless the interested parties have reached a settlement before the expiration of that period. No person may initiate an action against a municipality unless the claim has been denied in whole or part. *Any action brought pursuant to the Kansas tort claims act shall be commenced within the time period provided for in the code of*

*civil procedure or it shall·be forever barred, except that, if compliance with the provisions of this subsection would otherwise result in the barring of an action, such time period shall be extended by the time period required for compliance with the provisions of this subsection."* (Emphasis added.)

The parties do not challenge the appropriateness of this action under the Kansas Tort Claims Act, K.S.A. 75-6101 *et seq.*, nor do they challenge whether the Board would be considered a "municipality" under the Act. The Act applies to all tort claims against the state or municipalities, including counties and other political or taxing subdivisions. See K.S.A. 1992 Supp. 75-6102(b). As defined by K.S.A. 12-105a(a), the Board would fall within that section's definition of "municipality." As further noted by the Board, maintenance and construction of sewers are ordinarily considered governmental functions. *Foster v. Capital Gas and Electric Co.*, 125 Kan. 574, Syl. ¶ 4, 265 Pac. 81 (1928).

The following is a summary of the events relevant to the Board's statute·of limitations argument:

| | |
|---|---|
| 5/22/87 | Manhole collapsed |
| 6/13/88 | Original petition filed |
| 3/22/89 | Order dismissing original petition without prejudice |
| 3/29/89 | Notice and Claim served upon Board |
| 4/5/89 | Amended Notice and Claim served upon Board |
| 5/22/89 | Statute of limitations period expires |
| 7/27/89 | 120 days from Notice and Claim |
| 8/3/89 | 120 days from Amended Notice and Claim |
| 8/9/89 | Petition filed |
| 9/19/89 | 120 days from end of limitations period. |

The parties agree the Board took no action to approve or deny either Martin's initial or amended claim. Under 12-105b(d), after a claim had pended without action for 120 days, the claim is "deemed denied." Here, both claims pended without action for 120 days and were deemed denied on dates occurring after the statute of limitations had run. The specific question presented is the length of the extension of the statute of limitations provided by 12-105b(d) when a claim is denied after the statute of limitations has run.

The Board argues 12-105b(d) requires Martin to file this action either 120 days from the original notice of claim or at least 120 days from the amended notice. The Board argues Martin's

amended notice of claim should relate back to her original notice of claim but, even if the date of the amended notice of claim is the applicable date, the last date Martin could have filed her petition was August 4, 1989, the day after the amended notice of claim was deemed denied. According to the Board, Martin was out of time in either event because she filed her petition on August 9, 1989.

Martin argues that, if the rejection period extends beyond the end of the statute of limitations period, the statute of limitations is extended by the amount of time that elapses between the filing of the notice of claim with the municipality and its rejection of the claim. Under Martin's interpretation, the longest possible extension of the statute of limitations would be 120 days because that is the longest rejection period available to a municipality before the claim is "deemed denied." If Martin's interpretation is correct, regardless of which notice of claim triggered the 120-day rejection period, her action was timely filed as it was filed within the 120-day extension of the statute of limitations.

Martin cites *Stevenson v. Topeka City Council*, 245 Kan. 425, in support of her interpretation of the statute. In *Stevenson*, the court considered whether the requirements of the newly enacted 12-105b(d) applied to Stevenson's claim when the limitations period governing that claim expired 23 days after the statute was enacted. In holding that the statute was inapplicable, the court provided the following dicta, which Martin cites as instructive:

"It could be argued here that the statute provides a 120-day extension of the statute of limitations, and thus a reasonable time to commence a proceeding before the expiration of the limitation. However, this argument ignores the fact that Stevenson had only twenty-three days in which to provide notice of the claim. Such notice was necessary to activate the 120-day statute of limitations extension." 245 Kan. at 430.

While not cited by either party, Palmer & Snyder, *What Happened and What's Left after Judicial Scrutiny*, 57 J.K.B.A. 21 (Nov./Dec. 1988), also addresses 12-105b(d). The article contends the enactment of 12-105b(d) created two "traps":

"The first occurs when the claim is filed and the 120 days run shortly before the statute of limitation expires. In that situation, prudence would require an immediate filing upon the denial.

"A second trap is where the 120 days run or the denial itself is made after the statute of limitation has expired. There is no time set for extension within which to file nor is a reasonable period even suggested. Certainly a filing on the same day as the denial would comply with the statute, but anything beyond that is going to create some jeopardy for the plaintiff . . . ." 57 J.K.B.A. at 28.

The Board's interpretation of 12-105b(d) would create, and would be consistent with, the second trap identified in the article.

At issue is the interpretation of the following portion of 12-105b(d):

"Any action brought pursuant to the Kansas tort claims act shall be commenced within the time period provided for in the code of civil procedure or it shall be forever barred, except that, if compliance with the provisions of this subsection would otherwise result in the barring of an action, *such time period shall be extended by the time period required for compliance with the provisions of this subsection.*" (Emphasis added.)

In determining the length of the extension of the statute of limitations, the parties provide differing interpretations of the phrase "compliance with the provisions of this subsection." The Board effectively defines "compliance with the provisions of this subsection" when used to define the period of extension of the statute of limitations as including compliance with both the notice of claim requirement and the statute of limitations requirement. This interpretation results in an extension of the statute of limitations only for that portion of the rejection period which extends beyond the statute of limitations period. As applied in the present case, Martin's action would be timely filed if filed the day after the claim was "deemed denied."

Martin effectively defines "compliance with the provisions of this subsection" as including only compliance with the notice of claim requirement contained in 12-105b(d). As previously stated, this interpretation results in an extension of the statute of limitations for the same period that elapsed between the filing of the notice of claim and its rejection. As applied here, Martin's action is timely filed if filed within 120 days after the statute of limitations has expired. Under this interpretation, the last sentence of 12-105b(d) effectively provides that the applicable statute of limitations controls unless compliance with the notice of claim requirement bars the action. If the action is barred as a result of compliance with the notice of claim requirement, then the

statute of limitations is extended by the time necessary for compliance with the notice of claim requirement.

In our interpretation of the statute, we are guided by two important principles. First, "[w]hen construing a statute, a court should give words in common usage their natural and ordinary meaning." *Bank IV Wichita v. Plein,* 250 Kan. 701, 705-06, 830 P.2d 29 (1992). Second,"[a]s a general rule, statutes are construed to avoid unreasonable results." *Todd v. Kelly,* 251 Kan. at 515. We adopt Martin's interpretation of the statute as giving the words used by the legislature the natural and ordinary meaning and providing a reasonable interpretation. If the rejection period of a notice of claim filed pursuant to 12-105b(d) extends beyond the end of the statute of limitations period, the statute of limitations is extended by the amount of time that elapses between the filing of the notice of claim with the municipality and its rejection. The length of the extension of the statute of limitations will vary from case to case, but the longest possible extension of the statute of limitations would be 120 days.

While we are unable to locate any legislative history which addresses 12-105b(d), the language of the statute makes clear the legislature's intent to insure that a party complying with the statute's notice of claim provisions will not be prejudiced if during the 120-day rejection period the statute of limitations expires. Our interpretation of the statute gives voice to this intent. Further, the phrase "compliance with the provisions of this subsection" appears twice in the last sentence of 12-105b(d). By interpreting this phrase to include only compliance with the notice of claim requirement contained in 12-105b(d), this phrase would have the same meaning each time it appears in the last sentence of 12-105b(d). The Board's interpretation of the phrase does not lend itself to a similar consistent application.

While it is true, as the Board notes, that the legislature could have specifically provided for the extension of the limitations period in all cases for the length of the rejection period, the legislature apparently intended the extension to be contingent, as Martin argues, upon whether the claim was rejected or 120 days passed before expiration of the limitations period. As written, the statute creates two different rules which are applicable to the filing of an action after a claim is denied. The applicability of

either is contingent upon whether the claim was denied before or after the statute of limitations. These are the two "traps" identified in 57 J.K.B.A. 21, 28 (Nov./Dec. 1988).

While our interpretation of 12-105b(d) would eliminate the second trap, the first trap remains. The first trap could also be eliminated by amendment of the statute to clearly provide a period for a claimant to file an action after a claim has been denied. Under the Federal Tort Claims Act, a claimant has two years to present a claim to the appropriate agency and six months after that agency denies the claim to initiate an action. 28 U.S.C. § 2401(b) (1988), 28 U.S.C. § 2675 (1988). A statute which makes clear provision for a period during which a claimant is to file an action after the notice of claim is denied is preferable to a statute such as 12-105b(d) which creates traps.

II. Expert Testimony.

The Board contends the trial court erred by allowing Martin's expert witness, Robert Wessel, to testify. Specifically, the Board argues Wessel's testimony was contrary to established facts and was based purely on speculation.

"The admissibility of expert testimony is within the broad discretion of the trial court. A party claiming an abuse of trial court discretion bears the burden of showing abuse of discretion." *Marshall v. Mayflower Transit, Inc.*, 249 Kan. 620, Syl. ¶ 8, 822 P.2d 591 (1991).

The Board challenges Wessel's opinion as being contradictory to testimony of its witness, Darrell Thornbrue. Because Thornbrue, the only eyewitness to observe the manhole after its collapse, testified that it was his recollection the bricks at issue were stacked one on top of the other, the Board argues Wessel's contradictory testimony should not have been allowed. Wessel testified the bricks necessarily had to be angled inward toward the center of the manhole in order to support it and still fit the precast corbel below.

This contradiction does not necessarily require the court to exclude Wessel's testimony. See, e.g., *State v. Cruz*, 15 Kan. App. 2d 476, 486, 809 P.2d 1233, *rev. denied* 249 Kan. 777 (1991). Although the Board cites no law to support its contention, it is generally impermissible for an expert witness to give an

opinion contrary to the undisputed facts of the case, but an expert can assist the jury in arriving at a reasonable factual conclusion from the evidence. *Plains Transp. of Kan., Inc. v. King,* 224 Kan. 17, 24, 578 P.2d 1095 (1978). However, in the present case, the cause of the accident was very much disputed. In that light, the jury was entitled to weigh the evidence, including the testimony of Thornbrue and Wessel. See *Plains,* 224 Kan. at 23.

Further, Wessel's testimony meets the requirements of K.S.A. 60-456(b), which provides:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

The Board apparently does not challenge Wessel's expertise. The rest of Wessel's opinion was based on information provided to him concerning the design of the manhole and the facts surrounding the accident. In this context, we cannot say the trial court abused its discretion under 60-456(b) by allowing the testimony. It is important to note that Martin was unable to have anyone investigate and document the actual design or post-accident condition of the manhole because the manhole was repaired within hours of the accident.

## III. Res Ipsa Loquitur.

The Board contends the trial court erred by allowing this case to go to the jury on the theory of res ipsa loquitur. Among other things, the Board argues that, because Darrell Thornbrue testified the bricks were deteriorated, the cause of the accident was established and res ipsa loquitur was therefore inapplicable. Although Thornbrue's testimony might have provided an explanation for the accident, it did not necessarily fully explain what happened. "[U]nless the proof goes so far as to fully explain the cause of the injury by positive evidence revealing all of the facts and circumstances," the doctrine of res ipsa loquitur should not be removed by proof of specific negligence. *Hugo v. Manning,* 201 Kan. 391, Syl. ¶ 4, 441 P.2d 145 (1968).

"It has been stated repeatedly that the force and the justice of the doctrine [of res ipsa loquitur] stem from the consideration that the defendant in

control of the instrumentality has it within his power to produce evidence of the cause of injury, while the plaintiff is without such knowledge and must therefore rely on proof of the circumstances." *Rudy v. Whaley*, 188 Kan. 118, 123, 360 P.2d 863 (1961).

In this case, not only was the Board constructively in control of the manhole, but the manhole was completely repaired within hours after the accident, preventing ascertainment of the specific cause of the collapse. Although Thornbrue offered a possible suggestion as to what caused the collapse, the Board clearly had it within its power to preserve evidence pinpointing exactly what had occurred.

The Board also argues the first two elements of res ipsa loquitur were not present.

"Essential to the application of the doctrine of *res ipsa loquitur* is that (1) It must be shown that the thing or instrumentality causing the injury or damage was within the exclusive control of the defendant; (2) the occurrence must be of such kind or nature as ordinarily does not occur in the absence of someone's negligence; and (3) the occurrence must not have been due to contributory negligence of the plaintiff." *Bias v. Montgomery Elevator Co.*, 216 Kan. 341, Syl. ¶ 1, 532 P.2d 1053 (1975).

A. *Exclusive control*

The Board argues it did not have the "exclusive control" necessary to support a res ipsa loquitur instruction.

"In order to establish exclusive control it is not necessary for the plaintiff to eliminate all other possible causes of the accident. All that is required is that the plaintiff produce sufficient evidence from which a reasonable man could say that on the whole it was more likely than not there was negligence on the part of the defendant. If the evidence establishes that it was at least equally probable the negligence was that of another, the court should refuse to submit to the jury the negligence of the defendant on the theory of *res ipsa loquitur*." *Bias*, 216 Kan. 341, Syl. ¶ 2.

In this case, the only evidence presented indicated the Board had constructive control over the manhole and controlled its maintenance and repair. Therefore, we cannot say the court erred in finding the Board had control over the manhole that was exclusive for all intents and purposes.

B. *Occurrence does not ordinarily occur absent negligence*

The Board offers *Arnold Associates, Inc. v. City of Wichita*, 5 Kan. App. 2d 301, 615 P.2d 814 (1980), *rev. denied* 229 Kan. 669 (1981), as support for its contention that the collapse was not

something that does not ordinarily occur absent negligence. *Arnold* concerned the break of a water main, and the res ipsa loquitur doctrine was examined in that context. Since numerous factors could have caused the water main break, there was a question as to whether the break could have been predicted. Because it could not be determined whether the break would likely not have occurred absent negligence, the trial court's refusal to instruct on the doctrine was affirmed. In the present case, no specific cause for the collapse was established, and, therefore, the facts here are similar to those in a case that was examined in *Arnold.*

In *Adam Hat Stores v. Kansas City*, 316 S.W.2d 594, 598 (Mo. 1958), a water main broke about halfway through its minimum life expectancy and it was determined that the pipe was "defective when laid, was carelessly laid or maintained or was subjected to such internal or external force as to cause it to break, or that it broke as a result of the combination of one or more of those causes." The court in *Adam* held that res ipsa loquitur applied. We distinguished *Adam* because the cause of the break was unknown, whereas in *Arnold,* the break resulted from electrolysis.

As in *Adam,* here no definite cause of the collapse was established. A number of possible causes were offered, including deteriorated brick, bad brick, or deteriorated mortar with a particular placement of brick (angled inward as opposed to stacked vertically). Further, there was no formal inspection of the manhole prior to 1985. From this information, the court could conclude the Board was negligent in either maintaining the manhole or in accepting it when it was originally built.

IV. Motion for New Trial.

The Board argues the court erred in not granting its motion for new trial. When a trial court's denial of a motion for new trial is challenged, the appropriate standard of review is whether the trial court abused its discretion. *Wahwasuck v. Kansas Power & Light Co.*, 250 Kan. 606, 609, 828 P.2d 923 (1992).

A. *Jury misconduct*

Juror Hadel stated in an affidavit that juror Gross wanted to award Martin an amount that exceeded what was considered appropriate by four of the six jurors. Hadel further stated that

"Gross stated in effect that if the jury awarded an amount that was closer to the amounts discussed by four of the jurors, the County would 'laugh in our face' and not do anything to insure the safety of its manholes." Hadel continued by stating that, in order to reach a verdict, four of the jurors had to go higher than they felt was appropriate. Hadel also stated the jury considered plaintiff's lost wages in reaching a verdict. The Board's attorney provided an affidavit stating that, in response to her inquiries regarding the verdict, juror Gross " 'replied to Affiant in an extremely hostile manner: 'Where was your safety officer? Why didn't you have a safety officer on the stand?' " An administrative assistant stated in an affidavit that she overheard juror Isenberg say, " 'There, this amount should cover her attorney's fees and taxes.' "

Martin argues the foregoing statements are inadmissible as evidence of the jury's misconduct.

"Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined." K.S.A. 60-441.

The allegations that the jury improperly considered attorney fees, lost wages, and taxes do not require a new trial because the affidavits do not show that the jurors specifically changed their verdict based on inappropriate considerations. See *Cornejo v. Probst,* 6 Kan. App. 2d 529, 540, 630 P.2d 1202, *rev. denied* 230 Kan. 817 (1981). Hadel's affidavit reveals only that the jurors agreed to a verdict in an amount exceeding what they personally felt was appropriate, not that the higher verdict actually resulted from inappropriate considerations. The Board has failed to show a clear abuse of discretion in the trial court's refusal to grant the Board's motion for new trial on the basis of alleged juror misconduct.

B. *Verdict result of passion or prejudice*

The Board argues the jury's verdict was the result of passion and prejudice.

"Where the alleged passion or prejudice of the jury is not shown by definite proof, but depends for support solely on the size of the verdict, the award

will be upheld unless it shocks the conscience of the court. There is no simple, symmetrical pattern or design for determining whether a verdict is sufficient or insufficient, since each case must stand on its own facts." *Leiker v. Gafford,* 245 Kan. 325, Syl.¶ 10, 778 P.2d 823 (1989), *overruled in part on other grounds Martindale v. Tenny,* 250 Kan. 621, 629, 829 P.2d 561 (1992).

In support of its argument, the Board emphasizes the fact that Martin's hip pain is not continuous, but the Board ignores the other pain and difficulties endured by Martin. The Board also notes that, under current Kansas law, noneconomic damages are limited to $250,000 in actions for personal injuries incurred after July 1, 1988. K.S.A. 1992 Supp. 60-19a02(b). The Board then argues it is error to allow the jury's verdict, which exceeds that amount, when more serious injuries including disfigurement are limited to this same amount. Martin counters by emphasizing what she endured and by stating the $250,000 is not intended to cover the full spectrum of noneconomic damages.

The size of the verdict does not shock the conscience of this court. Considering the injuries sustained, the resulting pain and discomfort from those injuries, and the lengthy treatment and rehabilitation, we cannot conclude the court abused its discretion in denying the motion for new trial.

Affirmed.