(6 P.3d 871)

No. 77,600

AMANDA BUTLER, a minor, by and through COMMERCE BANK, N.A., her Conservator, *Appellant*, v. HCA HEALTH SERVICES OF KANSAS, INC., a Kansas Corporation, d/b/a WESLEY MEDICAL CENTER; SCOTT D. DESJARLAIS, M.D.; and DAVID D. DUKE, M.D., *Appellees*.

Opinion filed August 6, 1999.

*Randall E. Fisher*, of Law Offices of Randall E. Fisher, of Wichita, and *Gerald Michaud*, of Derby, for appellant.

*Eldon L. Boisseau, Anne M. Hull*, and *Wm. Paul Bouda*, of Turner & Boisseau, Chartered, of Wichita, for appellee Scott D. Desjarlais, M.D.

*Christopher A. McElgunn* and *Gary M. Austerman*, of Klenda, Mitchell, Austerman & Zuercher, of Wichita, for appellee David D. Duke, M.D.

*Michael L. North, John H. Gibson*, and *Judd A. Liebau*, of Boyer, Donaldson & Stewart, of Wichita, for appellee HCA Health Services of Kansas, Inc., a Kansas corporation, d/b/a Wesley Medical Center.

Before GERNON, P.J., PADDOCK, S.J., and DONALD R. NOLAND, District Judge, assigned.

GERNON, J.: Amanda Butler, a minor, by and through her conservator, Commerce Bank, N.A., appeals from a jury verdict and various pretrial and post-trial rulings in favor of the defendants, HCA Health Services of Kansas, Inc., d/b/a Wesley Medical Center (Wesley); Scott D. Desjarlais, M.D.; and David D. Duke, M.D., in a medical malpractice case.

Amanda Butler (Butler) was born to Alesia and Michael Butler at Wesley in August 1991. During Alesia's labor and delivery, she was monitored primarily by Dr. Desjarlais, a first-year resident, and Dr. Duke, a third-year resident. These physicians contracted with the Wichita Center for Graduate Medical Education (WCGME), which administered the residency program. WCGME, which was organized by Wesley, other medical organizations, and the University of Kansas School of Medicine in Wichita, operates the obstetrics/gynecology residency program at Wesley. WCGME is not a party to this case.

Alesia Butler arrived at Wesley on the day of Butler's delivery at 12:25 a.m. Approximately 12 hours later, at 12:20 p.m., she was fully dilated and 100% effaced. At this point, she had reached the second stage of labor and was taken to the delivery room. At 2:30

p.m., Pitocin, a drug which stimulates or augments contractions, was administered on Dr. Duke's orders and continued until 3:50 p.m. At that time, Dr. Duke determined that a caesarean section was necessary to deliver Butler. At the time the c-section was performed, Butler's head was tightly engaged in her mother's pelvis, and the delivery team had difficulty removing her. Upon Dr. Duke's instructions, a nurse inserted her hand in Alesia's vagina to push the baby's head up out of the pelvis. After an additional incision, Butler was finally removed through her mother's abdomen. The process took about 2 to 3 minutes.

It was immediately apparent that Butler was having problems. She was blue in color and seemed to have a decreased movement in her left arm. She had an initial Apgar score of two, the next lowest score for a live birth. She also had bruising around her head.

Shortly after birth, Butler was transferred to the newborn intensive care nursery. She was having trouble breathing and had poor muscle tone. Since her birth, Butler has been diagnosed as having a severe form of cerebral palsy and is moderately retarded. She has little or no functional ambulation due to the fact that at least three of her limbs are impaired. She has also exhibited behavioral problems. Experts testified that Butler would never be capable of living independently.

Butler and her parents filed suit against Wesley, Dr. Desjarlais, and Dr. Duke in September 1993. The petition asserted claims on behalf of Butler and her parents for negligence, negligent supervision of the resident physicians, and violation of the Emergency Medical Treatment and Active Labor Act of 1986.

A pretrial conference was held in November 1994, and a pretrial order was entered thereafter. Subsequently, Commerce Bank, N.A., was appointed as conservator of Butler's estate and was substituted as the representative of Butler. Butler's parents also asked that their individual claims be dismissed. The motion to substitute and to dismiss the parents' claims was granted the day before the trial.

Also on the day before trial, motions in limine and other pretrial motions were heard. The trial consumed a total of 25 court days.

After approximately 15 hours of jury deliberation, the jury returned the verdict form, stating that 10 jurors had agreed that no one was at fault in connection with Butler's condition.

A journal entry was filed reciting the jury's verdict, and Butler filed a motion to recall the jurors and a motion for new trial or for judgment n.o.v., raising a number of claims, including claims now asserted on appeal.

Hearings on the post-trial motions were held, and the district court struck an affidavit from Butler's attorney, Gerald Michaud, and denied Butler's motion alleging juror misconduct. All other issues contained in the post-trial motions were denied.

Butler filed a notice of appeal. Dr. Desjarlais also filed a notice of cross-appeal, challenging the trial court's denial of his motion for summary judgment. Dr. Desjarlais has failed to brief any issues on his cross-appeal and, therefore, the cross-appeal will be considered to have been abandoned. See *Crawford v. Board of Johnson County Comm'rs*, 13 Kan. App. 2d 592, 594, 776 P.2d 832 (1989).

## New Trial/Recall of Jurors

Butler's primary issue on appeal is whether the trial court erred in denying her motion for new trial and/or her motion to recall the jury based upon allegations of jury misconduct. The jury misconduct alleged by Butler included: (1) A juror brought a news story summarizing a medical journal article on fetal heart monitors to the jury room one day during the trial; (2) during deliberations, the jury discussed a settlement offer allegedly rejected by Butler; (3) some jurors expressed concerns or disagreements about the court's instructions; (4) during deliberations, the jury discussed government benefits available to Butler; (5) during deliberations, the jury discussed the possible effect of the verdict on the defendant physicians; (6) the jurors learned that one of the defendants' expert witnesses delivered the baby of a juror's wife during the trial; and (7) several jurors told Butler's counsel that the instructions were not adequate and the verdict was improper.

Whether to grant a new trial is a matter left to discretion of the trial court and will not be disturbed on appeal absent a showing of abuse of that discretion. *Cott v. Peppermint Twist Mgt. Co.*, 253

Kan. 452, 458, 856 P.2d 906 (1993). Abuse of discretion exists when the court's actions are arbitrary, fanciful, or unreasonable, or such that no reasonable person would take the view adopted by the district court. *Farm Credit Bank of Wichita v. Zerr*, 22 Kan. App. 2d 247, 255, 915 P.2d 137 (1996). Juror misconduct in civil and criminal cases is not grounds for reversal, new trial, or mistrial, unless it is shown to have substantially prejudiced a party's rights. The party claiming prejudice has the burden of proof. *State v. Griffin*, 262 Kan. 698, 704, 941 P.2d 941 (1997).

Butler contends that the court was required to find that the juror misconduct was harmless beyond a reasonable doubt. She relies on *Saucedo v. Winger*, 252 Kan. 718, 732, 850 P.2d 908 (1993). However, the *Saucedo* case involved juror misconduct of the most egregious sort. In that case, a juror relayed information from a family member who knew one of the witnesses, indicating that the witness lied; another juror suggested that the plaintiff's husband's uncle was a cocaine dealer and that the plaintiff's husband may have died of a cocaine overdose. The Kansas Supreme Court has not used the reasonable doubt standard in any case before or since *Saucedo*.

Here, Butler presented the affidavits of three jurors and of her attorney, Michaud. The trial court refused to consider the affidavit of Michaud. Absent extraordinary circumstances, affidavits of attorneys are not considered in determining whether juror misconduct has occurred. Counsel's affidavits usually contain mere hearsay, while the courts in these situations prefer affidavits from persons with personal knowledge of the facts. In addition, "[v]erbal comments to counsel by jurors following a trial are often made under some stress, may be easily misunderstood or subject to more than one interpretation." *Walters v. Hitchcock*, 237 Kan. 31, 36, 697 P.2d 847 (1985). The trial court's refusal to accept Michaud's affidavit is especially warranted in that his affidavit contains some allegations not confirmed in the jurors' affidavits.

The defendants contend that all or part of the jurors' various affidavits are inadmissible. K.S.A. 60-441 precludes consideration of evidence which shows "the effect of any statement, conduct, event or condition upon the mind of a juror *as influencing him or*

*her to assent to or dissent from the verdict or indictment or con-cerning the mental processes by which it was determined."* (Emphasis added.) K.S.A. 60-444(a) allows, however, evidence as to "conditions or occurrences either within or outside of the jury room *having a material bearing on the validity of the verdict* or the indictment, except as expressly limited by K.S.A. 60-441." (Emphasis added.) The line of demarcation between when such evidence is proper under K.S.A. 60-444(a) and inadmissible under K.S.A. 60-441, however, is not a bright line. *Verren v. City of Pittsburg,* 227 Kan. 259, 260-61, 607 P.2d 36 (1980).

In this case, the trial court had the benefit of affidavits from 7 of the 12 jurors. These affidavits were drafted by the attorneys involved in this case. As recently noted by the Supreme Court, juror affidavits filed in connection with motions for new trial "are seldom in the unprompted wording of the parties, but rather the products of our adversarial system." *Jones v. Sigg,* 261 Kan. 614, 619, 930 P.2d 1077 (1997). Such affidavits must be harmonized as much as possible to determine what happened. 261 Kan. at 619. The proffered affidavits must be sufficiently detailed to demonstrate just what the jurors did to determine whether their actions could constitute misconduct. *Cornejo v. Probst,* 6 Kan. App. 2d 529, 537, 630 P.2d 1202, *rev. denied* 230 Kan. 817 (1981). It is up to the trial court to determine the credibility of the witnesses in claims of juror misconduct. *State v. Heiskell,* 21 Kan. App. 2d 105, 109, 896 P.2d 1106 (1995).

### News Summary Brought in During Trial

Butler attacks the conduct of the juror who brought to the jury room a news summary she obtained off an internet news service. While the actual document was not available, the juror indicated in her affidavit that it was a more summarized version of a newspaper article attached to her affidavit. That article indicates that a study found that fetal heart monitoring does a poor job of detecting fetal distress before it leads to brain damage.

Butler contends that the juror's conduct in bringing outside information was inherently prejudicial because it related to a hotly contested issue in the case. Clearly, each parties' experts differed

about the causation of Butler's injuries. Butler's experts testified that her cerebral palsy and brain damage was caused by excessive trauma to her head during the prolonged second stage of labor and/or the pushing needed to remove her from her mother's pelvis during the c-section. Defendants' expert testified that based on the imaging studies, Butler's condition was caused by a post-birth infarction rather than trauma during the delivery.

However, it appears undisputed that all of the experts testified that the fetal heart monitor strips taken throughout Alesia's labor showed the fetus was not showing any distress. Because the fetal heart monitor readings were normal, the article in question would work more against the defendants than Butler; the defendants relied heavily on the normality of Butler's readings to show the absence of negligence. In any event, the jurors' affidavits did not clearly show that any juror discussed the article during deliberations.

In *Cleveland v. Wong*, 237 Kan. 410, 425, 701 P.2d 1301 (1985), the Supreme Court held that it was not reversible error to deny a new trial based on newspaper or magazine articles brought into the jury room during deliberations. In *Cleveland,* the court noted that while a newspaper article was mentioned during deliberations, the jurors indicated it was not considered and nothing showed that it had any effect on the jury's verdict. Moreover, it was not error to deny a new trial because of an article contained in a magazine in the jury room when there was no evidence that any juror saw or read the article. 237 Kan. at 425.

The record reflects that the juror brought the news summary to the jury room for 1 day. It appears that only one or two other jurors actually looked at the substance of the article. Moreover, there is no indication the news summary itself was discussed during deliberations. Finally, testimony from Butler's own expert witness on causation admitted that in a lot of cases of children with neurologic deficits, the cause of the deficit is never known or the damage is not preventable. Thus, the fact the jurors talked about possible and unknown causes of cerebral palsy only means they were discussing the evidence presented at trial. Without evidence of a specific re-

ferral to the article, Butler cannot show prejudice from the juror's conduct.

*Rejected Settlement Offer; Impact on Doctors' Careers*

Butler also complains that during deliberations, the members of the jury discussed information two of them overheard about a settlement offer Butler had purportedly rejected. The affidavits indicate that comments were made that Butler was greedy and should have taken the settlement. Another juror apparently also expressed concern that a verdict in favor of Butler might negatively affect the defendant doctors' medical careers. Reading the affidavits together, however, it appears these comments invoked only very short discussions, that jurors reminded each other that these matters could not be considered, and that the comments arose when a juror suggested awarding Butler monetary damages despite the lack of fault on the part of the defendants.

Kansas appellate courts have dealt with numerous cases where jurors have been found to have discussed such matters during deliberations. See, *e.g., Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 76, 755 P.2d 1319 (1988), *overruled on other grounds York v. InTrust Bank, N.A.*, 265 Kan. 271, 304, 962 P.2d 405 (1998) (discussion about including attorney fees in damage award); *Bohannon v. Peoples Taxicab Co.*, 145 Kan. 86, 87, 64 P.2d 1 (1937) (jurors discussed the mental disorders of family members while determining plaintiff's damages in a personal injury case involving claims of mental distress); *Newell v. City Ice Co.*, 140 Kan. 110, 111, 34 P.2d 558 (1934) (jurors discussed the likelihood defendant's vehicle carried insurance); *Anderson v. Thompson*, 137 Kan. 754, 758, 22 P.2d 438 (1933) (discussing dislike for party's attorney); *Martin v. Board of Johnson County Comm'rs*, 18 Kan. App. 2d 149, 162, 848 P.2d 1000 (1993) (discussions of attorney fees and taxes); *Cornejo*, 6 Kan. App. 2d at 538 (discussed taxability of award and payment of attorney fees).

In such cases, the courts have consistently held that remarks by one or more jurors about outside matters does not vitiate the verdict absent an affirmative showing the remarks prejudicially affected the verdict. *Bohannon*, 145 Kan. at 88; *Newell*, 140 Kan. at

113; *Anderson,* 137 Kan. at 758; *Martin,* 18 Kan. App. 2d at 162; *Cornejo,* 6 Kan. App. 2d at 540. Defendants point out an apt quotation from an older Supreme Court case:

"[T]he jury being what it is, jurors will act like human beings in the jury room, and will indulge in bluster and hyperbole and animated irrelevancies. Not only does the law presume a juror respects the obligation of his oath and votes his convictions, but generally he in fact does so; and due allowance must be made for some exuberance in jury-room discussion or the court must keep on granting new trials in important cases until a perfectly spiritless jury can be secured." *Anderson,* 137 Kan. at 758.

The affidavits, when read together, fail to establish that any of these remarks involved anything more than off-the-cuff comments during the jury's deliberations of the real issues. As a matter of reality, most juries probably discuss whether the parties had tried to settle a case and the effect that a verdict would have on either party. We find that the affidavits fail to establish that the jury relied on these remarks in making its final determination as to liability.

### Availability of Government Benefits

Butler also complains of the remark made by another juror, indicating that Butler would be eligible for government benefits. Her complaint is that the juror's remarks were based upon her personal knowledge and improperly injected collateral source issues into the deliberations.

The record reflects that the juror disclosed during voir dire that she was employed by the United States Department of Agriculture and worked with school lunch programs funded through her agency. The fact that the juror disclosed this information during voir dire should have apprised Butler that she might have personal knowledge about government benefits available to poor families. *Cf. Cleveland v. Wong,* 237 Kan. at 425 (rejecting claim of juror misconduct when nurse on jury defined medical terms for other jurors; parties knew of her background, and there was no indication she used her knowledge to influence other jurors).

The record also reflects that Butler brought up the welfare status of Alesia throughout the trial. The jury panel was told during voir

dire that Butler's parents were poor people and had a medical card from the county health department; they were specifically asked if they believed that poor people did not deserve the same level of health care services as others. Butler also elicited in Aleisa's testimony that they received medical treatment through a medical card. In closing, Butler's counsel noted that Butler's family got medical treatment through the county health clinic. Accordingly, Butler's own counsel, to some extent, placed the idea of welfare benefits in the minds of the jury.

The affidavits indicate that any discussion during deliberations about government benefits was brief, and the jurors understood the matter could not be considered by them in rendering a verdict. Moreover, Butler discussed the benefits her family already was receiving at the time of her birth. In light of the average person's knowledge that a broad range of benefits exist for poor people, a juror's reference to her personal knowledge was not prejudicial.

### Disagreements with Instructions

Butler also takes issue with one juror's apparent comment that he/she disagreed with the court's collateral source instruction. Butler's reliance on this disagreement with the instructions does not support her claim that a new trial was required. The only specific instructions mentioned in the affidavits which caused a juror or jurors problems dealt with the collateral source rule. However, the jury never reached the issue of damages.

In addition, the verdict is not so contrary to the evidence that it suggests a conspiracy to disregard the court's instructions. Absent a conscious conspiracy to disregard instructions, it is not an abuse of discretion to refuse to delve into the mental processes of the jury, and the court did not err in denying the motion for new trial. *State v. Wainwright*, 18 Kan. App. 2d 449, 453, 856 P.2d 163 (1993).

### Juror's Baby

During voir dire, Butler's counsel asked every juror whether they had children, whether there was any problems during the labor and delivery, and the identity of the obstetrician involved. One

juror informed counsel that his wife was 8 months' pregnant and their obstetrician, Dr. Westbrook, had an office in Wichita. The juror indicated that he did not know any of the defendants or any of the local expert witnesses. Sometime during the trial, the juror took his wife to another Wichita hospital for the delivery of their baby. Dr. Westbrook was unavailable, and Dr. Bammel came to deliver the baby; Dr. Bammel turned out to be an expert witness for one of the defendants. The juror had never met Dr. Bammel before. Although the name sounded familiar, the juror did not mention the trial to Dr. Bammel during the delivery.

Upon his return to the courthouse, the juror told his fellow jurors that Dr. Bammel delivered the baby. He then told the court. With the parties' agreement, the trial judge questioned the juror alone as to whether he could remain fair and impartial and whether he would weigh Dr. Bammel's testimony based on the evidence heard during the trial. The juror assured the court that he could. He agreed not to mention Dr. Bammel's involvement with his baby to his fellow jurors again. The court discussed its voir dire with the attorneys, and plaintiff's counsel indicated he was satisfied. However, the judge failed to tell counsel that the juror had already mentioned the matter to his fellow jurors. Butler's counsel had previously told the court he was willing to "rely on the court's judgment and never mention this again as to whether or not he can still be used as a juror."

Although Butler now claims that Dr. Bammel's involvement in this delivery was an amazing coincidence, this is not consistent with the record. The court specifically asked Dr. Bammel, outside the presence of the jury, about his participation in the juror's wife's delivery. Dr. Bammel testified that Dr. Westbrook was his partner, that Dr. Westbrook was out of town when the juror's baby came, and that he was the physician in the group on call at the time. Dr. Bammel was not aware that the juror was serving on this jury.

Butler claims in her reply brief that it is irrelevant that Dr. Bammel's delivery was not discussed during the jury deliberations. Butler's counsel complains that they did not learn about it until after Dr. Bammel completed his direct testimony. Butler cites nothing in the record to support this assertion. The juror clearly advised

the parties of the late stage of his wife's pregnancy during voir dire and the identity of her obstetrician. Butler could have readily determined whether any of the defendants or witnesses practiced with Dr. Westbrook. Moreover, Butler's counsel could have requested a mistrial at the time they learned of the situation but failed to do so.

Butler's claim was also weakened by the fact that she permitted another juror who knew a defense expert to remain on the jury. That juror had revealed during voir dire that one of her children was delivered by Dr. Brown and that she had Pitocin during that delivery, which resulted in a c-section. The fact that none of the jurors referred to the treatment they received from defendants' experts implies that the jurors did not consider giving additional weight to Dr. Bammel's testimony because of the delivery.

### Timing of the Misconduct

Finally, Butler's reply brief emphasized that all of these improper discussions occurred at the very end of the jury's deliberations and that all prior votes on the liability issue had been in favor of Butler. Counsel's argument is a substantial exaggeration of the actual statements in the jurors' affidavits. Butler's affidavits indicate that these discussions happened on the second day of deliberations but fail to state when during the day they occurred. At least one of the jurors' affidavits indicates these brief remarks were made at the end of the first day of deliberations or the very beginning of the second day. Counsel drafted the jurors' affidavits. Harmonizing the affidavits indicates that any improper comments were made early in the second day of deliberations and that the jurors continued to deliberate until the end of the day.

Likewise, the various affidavits indicate that several votes were taken on the liability question, but only two are specifically discussed. The first vote was taken at the very beginning of deliberations without any discussion of the evidence or the instructions. The only other vote specifically mentioned was the vote at the end of the second day, which was 10 to 2 in favor of defendants. The affidavits do not mention the results of any intervening votes by the panel during the 2 days of deliberations.

### *Conclusion*

Contrary to Butler's assertions, the standard of review in this situation is whether the district court abused its discretion. Based on the entire record, the district court could have legitimately either granted or denied the motion. Accordingly, we conclude the court's denial of the motion to recall the jury and the motion for new trial was not an abuse of discretion.

## Motion to Amend Pretrial Order

Butler next contends that she was substantially prejudiced when the district court denied her motions to amend the pretrial order to add new parties and new theories of recovery. She complains that the district court erred in denying (1) her motion to amend the pretrial order filed prior to trial; and (2) her motion to amend to conform to the evidence at the conclusion of the trial.

### *Pretrial Motions to Amend*

Suit was originally filed in September 1993. Extensive written discovery was exchanged and numerous depositions were scheduled. Discovery was ordered to terminate by August 31, 1994, and the parties were asked to submit a pretrial order by September 1, 1994.

Butler's proposed pretrial order was filed on November 17, 1994. This proposed pretrial order set forth 16 allegations of negligence against Drs. Duke and Desjarlais. She also alleged Wesley and its personnel were negligent in a number of respects. Butler's proposed pretrial order noted that while discovery was not complete, the case was ready for trial except for some scheduled depositions. A final pretrial conference was held on November 21, 1994, and a pretrial order was filed that same day.

On the same day she filed her pretrial conference order, Butler filed a motion to amend the petition, seeking leave to add WCGME and Dr. Richard Meisel as defendants to the case. She alleged that WCGME ran the obstetric/gynecological residency program at Wesley and that Dr. Meisel was the supervising physician over Drs. Desjarlais and Duke while they treated Alesia and Butler. Butler asserted that WCGME, together with Wesley and

Meisel, were negligent in extending staff privileges to Drs. Desjarlais and Duke and failed to adequately monitor and supervise the residents. A hearing was set on December 2, 1994, to hear the motion to amend. Butler's attorneys failed to appear at the hearing, and the motion was denied.

A month later, Butler filed a motion to set aside the pretrial conference order and to establish a new scheduling order. Butler argued that the trial date of January 10, 1995, had been delayed at the request of the defendants so that Dr. Desjarlais could obtain independent counsel. She also filed a motion to add new parties, again seeking to add Dr. Richard Meisel, WCGME, the University of Kansas School of Medicine at Wichita, and the Wesley Clinic as parties. Butler asserted she did not learn until after the pretrial order was filed that Drs. Duke and Desjarlais might not be employees or agents of Wesley. She blamed this delay, at least in part, on delays in obtaining discovery documents from Wesley. She also issued a trial subpoena requiring production of additional documents from Wesley and WCGME for trial. These entities filed motions to quash the subpoenas.

On January 20, 1995, the court heard Butler's motion to amend and the motions to quash subpoenas. The court quashed the subpoena directed at Wesley because Butler willingly failed to follow up on Wesley's responses to requests for production until after discovery closed. The court ruled that Butler could not wait until after discovery closed to subpoena documents from Wesley. The court also rejected Butler's efforts to amend her claims against Wesley to allege negligence in supervising the residency program. The journal entry noted Butler's unexplained delay in seeking to compel discovery. The court also noted that Butler had voluntarily withdrawn her November 1994 motion to add new defendants based upon stipulations included in the pretrial order. Based upon Butler's counsel's decisions, the trial court refused to amend the pretrial order. The trial court did permit Butler, however, to obtain documents from WCGME, a nonparty.

Butler claims that the trial court abused its discretion in denying her motion to amend the pretrial order to add new parties. The general rule provides that a trial court has broad discretionary

power to amend the pleadings. The exercise of that discretion will not constitute reversible error unless it affirmatively appears that the amendment allowed or denied is so material it affects the substantial rights of the adverse party. *Anderson v. Heartland Oil & Gas, Inc.*, 249 Kan. 458, 470, 819 P.2d 1192 (1991), *cert. denied* 504 U.S. 912 (1992). The party seeking to amend a pretrial order must show manifest injustice. K.S.A. 60-216(a).

Butler claims the refusal of the court to amend the pretrial order to add new parties substantially impaired her right to pursue all parties who might be at fault. She argues that she did not discover WCGME's or Dr. Meisel's involvement until after the close of discovery. However, the trial court found that Butler had not justified her delay in pursuing her discovery requests. Without a transcript of the hearing, we are left with only the motions and the court's journal entry to determine the parties' arguments and the court's reasoning. In this case, all the parties had completed extensive discovery. Adding completely new parties essentially would have started the case all over.

The trial had only been delayed because Dr. Desjarlais wanted independent counsel after losing his summary judgment motion. The extension also was, in part, the responsibility of Butler. Dr. Desjarlais lost that motion after one of Butler's experts expanded his opinion regarding Dr. Desjarlais' treatment.

The court's basis for refusing to amend was not arbitrary. A party's failure to follow up on its own discovery is a factor the court may consider when ruling on a motion to amend. *Cf. Clevenger v. Catholic Social Service of the Archdiocese of Kansas City*, 21 Kan. App. 2d 521, 524, 901 P.2d 529 (1995) (upholding denial of motion to amend filed 15 months after suit was filed; new claim could have been ascertained from defendants' original discovery responses).

Butler argues that defendants' subsequent actions at trial made the court's pretrial ruling extremely prejudicial. Butler apparently abandoned her first motion to amend the pretrial order after the parties included a stipulation in the pretrial order that they agreed they would not present evidence of negligence or attempt to compare the fault of any nonparty. Butler asserts that defendants, in

their closing arguments, clearly violated this stipulation by claiming she sued the wrong parties.

The record reflects that during closing, Dr. Desjarlais' attorney argued that Butler had asserted allegations against Dr. Meisel and the team of health care providers responsible for Alesia's and Butler's care. Counsel also noted that Butler had not chosen to sue Dr. Meisel or the team. Butler's counsel objected, and the court advised the jury to disregard counsel's statement. Counsel then went on to argue that the jury had to find specifically that Dr. Desjarlais was negligent and not hold him responsible just because he was a member of a team.

Butler's argument asserts a claim of attorney misconduct. For remarks in closing statement to constitute reversible error, there must be a likelihood that the improper remarks changed the result of the trial. *Walters v. Hitchcock*, 237 Kan. at 33. In this case, Butler has cited only two brief remarks in the entire case as the basis of her claim of prejudice. However, the court sustained her objection to the remarks and instructed the jury to disregard them. On appeal, a jury will be presumed to have disregarded evidence about which an objection was sustained. *Fitzpatrick v. Allen*, 24 Kan. App. 2d 896, 901, 955 P.2d 141, *rev. denied* 264 Kan. 821 (1998).

We conclude that the trial court did not abuse its discretion in denying Butler's pretrial motions to add additional parties to the case. Counsel's comments during closing, which were stricken by the court, were not substantially prejudicial.

### Motion Made During the Trial

Butler next objects to the trial court's refusal to amend the pretrial order at the conclusion of the case. She claims the issues of Wesley's failure to supervise the residency program, breach of the admission agreement, lack of informed consent, and res ipsa loquitur were tried by consent. Butler contends that the court's failure to amend the pretrial order to conform to the evidence was reversible error.

Butler contends that amendment is mandatory under K.S.A. 60-215(b) because the issues were tried by express or implied consent.

However, the statute only provides that new issues "shall" be treated as if raised in the pleadings if they are tried by express or implied consent of the parties. The statute further provides that the court "may" allow the pleadings to be amended if the evidence is objected to at trial. K.S.A. 60-215(b).

Butler also asserts that our standard of review is de novo but cites no authority for this position. The granting or denying of a motion to amend is generally left to the discretion of the trial court. *Anderson v. Heartland Oil & Gas, Inc.*, 249 Kan. at 470. The issue here is whether Butler's new theories were tried by express or implied consent. Federal courts have interpreted Rule 15(b) as limiting review of such a determination to abuse of discretion. *In re Woodcock*, 45 F.3d 363, 368 (10th Cir.), *cert. denied* 516 U.S. 828 (1995).

It should be noted that Butler does not specifically cite any portion of the record at the beginning of the trial where it put the defendants on notice that she would be pursuing these claims. Even the case cited by Butler found an issue had been tried by implied consent when the defendants raised the new issue at the beginning of the trial and presented evidence on the issue unchallenged. See *Kirkland v. District of Columbia*, 70 F.3d 629, 632-33 (D.C. Cir. 1995).

### *Wesley's Liability for Operation of the Residency Program*

Butler contends that the district court erred in failing to allow the pretrial order to be amended to assert a claim that Wesley was negligent in the manner in which it permitted the residency program to be run. We disagree.

First, Butler fails to cite any portion of the record to show that this issue was tried by consent. Absent any citation to the record, this court must presume that the record does not support this claim. In fact, the trial court did permit—over Wesley's adamant objection—Butler to assert that Drs. Duke and Desjarlais were, in reality, employees of Wesley. The jury verdict form included questions asking whether these defendants were employees of Wesley or WCGME or were independent contractors. Moreover, the court permitted Butler to present evidence about Wesley's own rules and

regulations in order to give the jury the ability to determine whether Wesley violated some independent duty arising from those rules.

The record reflects that Wesley repeatedly objected to Butler's efforts to blame Wesley for the manner in which the residency program was run. Defendants objected when Butler attempted to ask jurors in voir dire who had been patients at Wesley if they were told about the residency program and whether it was explained to them at the hospital. Wesley objected to evidence regarding its training and protocol manuals during testimony of Dr. Horbelt, the director of the WCGME residency program. Wesley also objected to questions posed to Butler's expert about the residency program. Wesley even moved for a mistrial after the court permitted expert testimony that Wesley was negligent in the management of the residency program. Wesley filed a supplemental trial brief, arguing that it could not be held liable for the negligence of other health care providers, including Drs. Duke and Desjarlais.

Under the circumstances, we find no basis to conclude that this issue was tried by consent. We further conclude that Butler was not prejudiced because she was allowed to "back-door" her claim against the residency program against Wesley to some extent.

### Claims of Lack of Informed Consent, Res Ipsa Loquitur, and Breach of Contract

Butler also claims that the issues of lack of informed consent, breach of the admission agreement, and res ipsa loquitur were tried by consent. She cites the record where the admission agreement was discussed by various witnesses. However, there is nothing in the record that Butler was pursuing a breach of contract claim. Defendants did object to some of this testimony. Moreover, Butler argued that the evidence was relevant to establish that Wesley violated its own rules and protocols, rather than a separate breach of contract claim.

As for the issue of informed consent, Butler's counsel did comment about the necessity of informed consent during the jury voir dire. However, defense counsel immediately objected, and the court sustained the objection. Several of the expert witnesses and

medical fact witnesses testified that informed consent was required. However, when Butler attempted to question Alesia as to whether the doctors had told her about alternatives to prolonged labor or to a caesarian section, a defense attorney objected as irrelevant and improper rebuttal. The court overruled the objection but sustained further objections to questions of whether Alesia would have chosen a different course of treatment. Butler later made a proffer of Alesia's testimony about lack of informed consent.

The record shows that the defendants objected to key portions of testimony that might pertain to a claim of lack of informed consent and breach of the admission agreement. Under the circumstances, it was not an abuse of discretion for the trial court to find these claims were not tried by implied consent, to refuse to grant Butler's motion to amend the pretrial order, or to give an instruction on these claims.

Finally, Butler wanted the court to instruct the jury on the doctrine of res ipsa loquitur. Her brief fails to establish how the doctrine of res ipsa loquitur could apply in this case or what evidence was presented to support such a claim. In medical malpractice cases, the doctrine only applies when a layman could find, as a matter of common knowledge, that the patient's condition was such that would ordinarily not have occurred if due care had been exercised. *Tatro v. Lueken*, 212 Kan. 606, 611, 512 P.2d 529 (1973).

In this case, both liability and causation had to be established by expert witnesses, and the parties presented conflicting testimony from experts on these issues. We find no basis in the record that res ipsa loquitur would apply, even if it was tried by consent.

## Addition of Witnesses

In December 1994, Dr. Desjarlais filed a motion for summary judgment. Desjarlais argued that none of Butler's experts identified any actual negligence on his part and that all of the experts opined that Butler's injuries were received during the performance of the caesarian section, in which he did not participate. In response, Butler filed an affidavit from one of her experts, which stated that his criticisms of Dr. Duke applied equally to Dr. Desjarlais. The

trial court ultimately denied Dr. Desjarlais' summary judgment motion, finding that the affidavit from Butler's expert did not contradict his prior deposition testimony and, therefore, could be considered.

After his summary judgment motion was denied, Dr. Desjarlais filed a motion to enforce the pretrial order. Dr. Desjarlais argued that the court's original pretrial order should control and that Butler's experts should be limited to their original written opinions and depositions, none of which specifically mentioned any error by Dr. Desjarlais. In the alternative, Dr. Desjarlais requested leave to redepose Butler's expert, Dr. Wade, and an opportunity to retain experts to respond to Dr. Wade's new opinions regarding him. A hearing was held, after which the court gave Dr. Desjarlais leave to redepose Butler's obstetrics experts. The order provided that after these depositions were taken, Dr. Desjarlais could file a motion to name additional expert witnesses on his own behalf if he believed it was necessary.

On December 18, 1995, Dr. Desjarlais filed a motion to name additional expert witnesses. Because of scheduling difficulties, Butler's experts were not redeposed until early November 1995, at which time they purportedly set forth opinions not previously made. For these reasons, Dr. Desjarlais requested leave to name two additional expert witnesses. The court permitted Dr. Desjarlais to add Drs. Smith and Evans as additional expert witnesses on his behalf and granted Butler leave to depose these new witnesses.

Thereafter, Butler moved to strike those two experts because Dr. Desjarlais had only provided the written report from one of the experts and because those experts would not be available for deposition until 1 week before the trial was set to begin. The court denied Butler's motion. Butler's counsel then sent a letter to Dr. Desjarlais' attorney, indicating that Butler did not wish to depose those experts because of their limited availability and the nearness to the trial. Nothing in the record reflects that Butler requested to add additional experts to respond to Dr. Desjarlais' new witnesses.

Butler agrees that decisions regarding the control and conduct of discovery in a civil case is a matter left to the broad discretion of the trial court. Accordingly, such rulings will be reversed only

upon a clear showing of abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court. *Hill v. Farm Bur. Mut. Ins. Co.*, 263 Kan. 703, 704, 952 P.2d 1286 (1998).

Butler claims that she was substantially prejudiced by the addition of Dr. Desjarlais' two expert witnesses. However, she fails to support these assertions with any details about unanticipated opinions or testimony from these experts. Assertions in an appellate brief are not sufficient to satisfy inadequacies in the record on appeal. *Smith v. Printup*, 254 Kan. 315, 353, 866 P.2d 985 (1993).

The record reflects that Dr. Desjarlais' expert witnesses only testified that in their opinion, Dr. Desjarlais' actions were within the standard of care. Dr. Carl Smith testified that on his review of the records, Dr. Desjarlais' handling of Butler's case was within the standard of care of a fifth-week resident and that his conduct of the labor in this case met the standard of care. Dr. Smith's testimony appears to negate the specific allegations of negligence asserted by Butler's experts—that he found nothing of concern in the ordering of Pitocin, the length of the second stage of labor, the progress of labor as reflected in the vaginal exams, Dr. Desjarlais' indication of the baby's station, or the question of impaction. Dr. John Evans also testified that Dr. Desjarlais acted within the standard of care for a fifth-week resident; his testimony essentially mirrors that of Dr. Smith.

If there is any basis to find an abuse of discretion under the circumstances, Butler has failed to establish substantial prejudice. " 'Harmless error is error which does not prejudice the substantial rights of a party. It affords no basis for a reversal of a judgment and must be disregarded.' [Citation omitted.]" *Tamplin v. Star Lumber & Supply Co.*, 251 Kan. 300, 308, 836 P.2d 1102 (1992).

### Redeposition of Dr. Desjarlais

Dr. Desjarlais had first been deposed by Butler in January 1994. In January 1995, a Tennessee attorney, William Killian, contacted Butler's attorneys about the possibility of settlement with Dr. Des-

jarlais. According to several of Butler's attorneys and staff, Killian advised them that Dr. Desjarlais had reviewed all the medical records and discovery, which refreshed Desjarlais' memory. The attorney advised that Dr. Desjarlais had made extensive notes about what he remembered had occurred on the date of Butler's delivery and implied that he had remembered new information.

Several days thereafter, the law firm of Turner and Boisseau entered a separate appearance on behalf of Dr. Desjarlais. On that same day, Butler filed a notice of deposition duces tecum on Dr. Desjarlais, and Dr. Desjarlais filed a motion to quash the notice. In response, Butler argued that Dr. Desjarlais had authorized the attorney to produce the handwritten notes to Butler and had, therefore, waived any claim of privilege. Butler also argued the documents would be discoverable under the crime-fraud exception to the attorney-client privilege or were not otherwise privileged.

A hearing was held on this issue. The court ordered Butler to submit various interrogatories to Dr. Desjarlais about the documents. According to Dr. Desjarlais' interrogatory responses, he consulted with Killian in December 1994 and January 1995 about his desire to file a malicious prosecution action against Butler's attorneys. Dr. Desjarlais indicated he had prepared handwritten notes on December 30, 1994, and provided the same to his attorney. Dr. Desjarlais also offered to provide copies of those notes to the court for an in camera inspection.

Another hearing was held in March 1995. A week before the hearing, Butler filed a motion to depose Killian. Dr. Desjarlais objected to Butler's efforts to depose Killian on the grounds of attorney-client privilege. The court heard arguments on the Butler's efforts to redepose Dr. Desjarlais and to depose Killian. In a later journal entry, the trial court found that Dr. Desjarlais did not waive his attorney-client privilege and that neither deposition would be allowed to go forward. The court specifically noted that it had reviewed the handwritten notes Dr. Desjarlais had provided to Killian.

During trial, Butler again raised the question of obtaining Dr. Desjarlais' notes. Dr. Desjarlais was called as a plaintiff's witness. At the conclusion of Butler's direct examination of Dr. Desjarlais,

counsel asked whether he had made any notes about what happened on the day of Amanda's birth, other than notes made part of Wesley's official medical records. Outside the hearing of the jury, the attorneys again argued about the notes Dr. Desjarlais had provided Killian which Judge Corrigan had refused to order turned over to Butler.

Before the jury, the court permitted Butler to question Dr. Desjarlais under oath. Dr. Desjarlais stated that he had written the notes in response to the pending summary judgment motions and had given them to Killian. He agreed to allow Killian to call Butler's attorneys to end his involvement in the lawsuit. Dr. Desjarlais did not recall Killian ever asking for permission to share his notes with Butler's attorney and did not expressly agree to share the notes. However, Dr. Desjarlais also admitted later that he did not care if Killian had so used the notes. Before any documents were turned over, Dr. Desjarlais had retained Turner and Boisseau, and the attorney-client privilege was reasserted. The trial court found that no express authorization was given to Killian to share Dr. Desjarlais' notes and that the attorney-client privilege had not been waived.

Butler contends that Dr. Desjarlais' testimony reflects that he waived his claim of privilege regarding the notes and implies that it was only the attorneys who were asserting the privilege claim. The parties do not dispute that the privilege belongs to the client and that only the client can waive or assert the privilege. K.S.A. 60-426(a). See also *State v. Maxwell*, 10 Kan. App. 2d 62, 64, 691 P.2d 1316 (1984), *rev. denied* 236 Kan. 876 (1985) (unauthorized disclosure of client confidences by attorney does not constitute waiver of the privilege).

The standard of review of this issue is less than clear. Most cases reviewing issues of attorney-client privilege are silent on the scope of an appellate court's review. In the cases cited by Butler, the appellate court appeared to review the issue de novo; however, the facts did not appear to be disputed to any substantial degree in those cases. See, *e.g.*, *State v. Newman*, 235 Kan. 29, 680 P.2d 257 (1984). In other contexts, however, the appellate courts have reviewed to determine whether the district court's findings of fact

are supported by substantial competent evidence and are sufficient to support the conclusions of law; any conclusions of law are subject to unlimited review. See *Barragree v. Tri-County Electric Co-op, Inc.*, 263 Kan. 446, Syl. ¶ 1, 950 P.2d 1351 (1997) (setting forth standard of review in cases involving the disqualification of attorneys in civil cases because of conflicts of interest). Based upon the record, Butler's claims fail even if the trial court's rulings are reviewed de novo.

The two district court judges presiding over this case both concluded that Dr. Desjarlais had not waived the attorney-client privilege as to the notes. Dr. Desjarlais testified that he never expressly gave his Tennessee attorney permission to share the notes with Butler's counsel. Disclosure of information by counsel without the client's consent does not waive the privilege. *Maxwell*, 10 Kan. App. 2d at 64. Similarly, after-the-fact statements by the client indicating he would not have objected if he had been asked seems a tenuous basis to support a waiver of an important privilege. The Kansas Supreme Court has recognized that the attorney-client privilege is not to be set aside lightly. *Wallace, Saunders, Austin, Brown & Enochs, Chtd. v. Louisburg Grain Co.*, 250 Kan. 54, 63, 824 P.2d 933 (1992).

Even if there was some implied waiver by Dr. Desjarlais to disclosing the privileged documents, any waiver was expressly withdrawn before any disclosure was made. There are some authorities which recognized that "the waiver of a privileged communication may be withdrawn at any time before it has been acted on, where no advantage has accrued to either litigant on account thereof." 81 Am. Jur. 2d, Witnesses § 294, p. 281. See also *Lohman v. Superior Court*, 81 Cal. App. 3d 90, 95, 146 Cal. Rptr. 171 (1978) (intent to disclose privileged information insufficient to waiver privilege; waiver only exists when actual disclosure is made); *Squealer Feeds v. Pickering*, 530 N.W.2d 678, 685 (Iowa 1995) (recognizing that withdrawal of an expert from a list of testifying witnesses can reinstate the work product privilege covering nontestifying expert).

In this case, Dr. Desjarlais, through his new attorneys, reasserted the claim of attorney-client privilege to the notes prior to any actual disclosure and within a few days of his Tennessee attorney's offer

of the notes. Butler has not claimed she detrimentally relied in any way on such a proffer of this information.

Butler also argues that the notes were essential to impeach Dr. Desjarlais and other witnesses because it was obvious that Dr. Desjarlais was concealing facts and evidence. This appears to be a similar argument to Butler's pretrial claim that the notes fell within the crime-fraud exception of K.S.A. 60-426. To invoke the crime-fraud exception, however, Butler must establish a prima facie case of fraud. See *Wallace, Saunders, Austin, Brown & Enochs, Chtd.,* 250 Kan. at 61.

In this case, the only indicia of fraud is Butler's claim that Killian stated that Dr. Desjarlais was recalling new information about the events during Alesia's labor and delivery. Killian submitted an affidavit disputing Butler's assertions. The district court, after reviewing the documents in question, found they were privileged. Because Butler failed to include the documents inspected by the trial court, there is no basis to find that the trial court erred in this regard. An appellant has the burden to designate a record sufficient to establish the claimed error. Without an adequate record, the claim of alleged error fails. *McCubbin v. Walker,* 256 Kan. 276, 295, 886 P.2d 790 (1994).

Butler also contends that the seriousness of the new information set forth in Dr. Desjarlais' notes caused him to retain new counsel and obtain a 1-year delay in the trial. However, the record reflects that the trial was continued for the most part to allow Dr. Desjarlais to obtain expert witnesses to respond to the expanded opinions of Butler's experts, as discussed in the preceding issue.

The district court did not err in refusing to order disclosure of Dr. Desjarlais' notes to his attorneys. Therefore, there is no error in refusing to permit Butler to redepose Dr. Desjarlais. The sole basis for the new deposition was to explore the information contained in the notes in dispute. Butler failed to establish that the absence of this second deposition prejudiced her in any way. There is no assertion that Dr. Desjarlais' trial testimony deviated from his earlier discovery deposition in any significant respect.

We find no reversible error.

## Voir Dire

Butler next argues that the trial court erred in limiting counsel's voir dire questions to the jury panel. She argues that reversible error was committed when the court prohibited counsel from questioning potential jurors in detail about their prior jury experience, especially in medical malpractice cases. The extent of the examination of prospective jurors during voir dire is within the sound discretion of the trial court. Appellate courts will not interfere with this process unless a clear abuse of discretion is established. *State v. Neighbors*, 21 Kan. App. 2d 824, 830, 908 P.2d 649 (1995).

The record reflects that voir dire was conducted by the court and the parties for one entire day. During voir dire, Butler's attorney asked the jurors about whether they had prior jury experience. Counsel asked one of the jurors about the type of case he was involved in and whether a verdict was rendered. When counsel asked what the verdict was, the court advised that the juror should only answer whether a verdict was reached but not what the verdict was. The court said counsel could inquire whether the person was the jury foreperson, the type of case involved, and whether a verdict was returned. Another of the jurors said she had served as a juror in a medical malpractice case 15 to 20 years ago. The court refused to allow counsel to ask what the verdict was in that case. In questioning other jurors, the court allowed Butler to register an on-going objection to the restrictions on questioning the jury. After conferring with all persons who had prior jury experience, they were all asked if anything from their prior jury experience might influence them in this case; all the jurors apparently responded that it would not.

Prior to exercising their peremptory strikes, Butler's counsel again requested to be allowed to ask the potential jurors who had served previously on juries in civil trials about the actual verdict they rendered. The trial court again refused. Thereafter, the parties exercised their peremptory challenges, and the jury was seated.

In challenging the court's limits on voir dire, Butler relies on a variety of cases from other states where trial courts in malpractice actions were reversed for limiting voir dire of jury members. Those

cases, however, involved situations where the plaintiffs' attorneys had wanted to question potential jurors about their exposure to media stories of an alleged medical malpractice crisis, an insurance crisis, or tort reform measures. See *Kozlowski v. Rush*, 121 Idaho 825, 828 P.2d 854 (1992); *Babcock v. Northwest Memorial Hosp.*, 767 S.W.2d 705 (Tex. 1989); *Barrett v. Peterson*, 868 P.2d 96 (Utah App. 1993); *Evans By and Through Evans v. Doty*, 824 P.2d 460 (Utah App. 1991), *cert. denied* 836 P.2d 1383 (1992). In most of these cases, the trial court limited the inquiry because of fear of exposing the jury to the idea that insurance might be involved.

In rejecting the court's limited voir dire, each of these courts focused on the fact that there recently had been some form of pervasive dissemination of tort reform information by the insurance industry, especially in the medical malpractice arena. Voir dire was necessary in order to determine which potential jurors had been exposed to advertisements or media accounts of such tort reform campaigns and whether they had developed biases as a result of such exposure. See *Kozlowski* 121 Idaho at 832-33; *Babcock* 767 S.W.2d at 708-09; *Barrett* 868 P.2d at 101; *Evans* 824 P.2d at 467.

The cases cited by Butler all deal with questioning the venire panel about exposure to tort reform campaigns and information. In this case, the court permitted questioning by Butler's counsel in this area. The jurors were asked if they believed there were too many lawsuits against doctors and hospitals and whether they had any preconceived ideas that juries were awarding too much in damages in the personal injury or malpractice cases. Thus, it is clear that the trial court did not limit Butler's counsel in exploring the jurors' views about tort reform or any medical malpractice crisis.

Several courts have held that a trial court's failure to permit a party from inquiring about the actual verdict rendered by a juror in an earlier case was not an abuse of discretion. The most persuasive reasoning can be found in *State v. Couture*, 218 Conn. 309, 589 A.2d 343 (1991). In *Couture*, a criminal defendant argued that the court improperly limited his right to voir dire by preventing him from asking a potential juror about whether a guilty or not guilty verdict was rendered by the criminal jury on which he pre-

viously served. The defendant contended such information was necessary to make full use of his peremptory challenges. The Connecticut court disagreed with the defendant's reasoning. The court held:

"A jury is presumed to have followed the trial court's instructions. [Citation omitted.] A criminal jury's sole function is to set aside the personal prejudices of its individual members, to weigh dispassionately the evidence set before it, and, on the basis of the trial court's instructions, to determine whether the state has proved the defendant's guilt beyond a reasonable doubt. [Citations omitted.] That a jury returns a verdict of guilty in a given case, therefore, has nothing to do with the 'possible predispositions' of a juror, and everything to do with the particular factual and legal contours of the case as it was presented to the jury. Standing alone, the fact that a jury returns a guilty verdict is not probative of the personal views of the individual jurors." 218 Conn. at 319.

See also *Com. v. Fisher*, 545 Pa. 233, 249, 681 A.2d 130 (1996) (such questioning not necessary in a capital murder case because prospective juror unequivocally stated nothing from prior jury experience would predispose her in the present case); *Bohner v. Stine*, 316 Pa. Super. 426, 435-36, 463 A.2d 438 (1983) (upholding trial court's refusal to permit similar questioning in a personal injury case because the questions would not tend to reflect on the competency of the person to serve on the jury).

Butler argues that the voir dire was necessary to enable the parties to develop the potential juror's biases. The purpose of voir dire is to enable the parties to select jurors without bias, prejudice, or partiality. *Neighbors*, 21 Kan. App. 2d at 830. However, for Butler's questioning to achieve this goal, she would have to inquire not only into the actual verdict, but also into details of the prior case, in order to determine whether any possible bias existed or to truly evaluate whether the potential juror should be left on the jury panel. In light of the number of jurors in this case who had previously served as jurors in civil cases, such questioning would have likely greatly extended an already lengthy voir dire process with only minimal benefit to the parties.

Based upon the entire record, Butler appears to have had ample opportunity to determine whether the potential jurors had any biases in favor of one party or another. She fails to explain how the

question not being allowed prevented her from exposing any biases the venire may have had in light of the numerous other questions asked of the jurors generally.

We find no abuse of discretion here.

### Time Limits

Butler contends the court committed reversible error in limiting her time in cross-examining the defendants' witnesses. Butler moved for sanctions at the end of one day. She argued that defendants were purposefully prolonging cross-examination of her expert witnesses to hold them overnight and to increase her costs. The court denied the motion but suggested that the motion was more properly one to invoke Supreme Court Rule 161 (1998 Kan. Ct. R. Annot. 185), which permits only one attorney to examine or cross-examine a witness on behalf of all parties united in interest. The next morning, Butler's counsel officially made a motion under Rule 161. At the end of the day, the parties argued the matter. The court then ruled that the three defendants would be limited in cross-examination to the amount of time that Butler expended in direct examination. The court also ruled that the same rule would apply to Butler in the defendants' case. None of the parties voiced any objection at this time, and the case proceeded under that rule.

Butler rested her case on March 7, and the defendants' evidence ended on March 15, 1996. On March 12, 1996, Butler asked to be relieved from the order limiting the time of cross-examination. The court declined to do so because Butler waited to complain until after she ended her portion of the case. On March 13, 1996, Butler filed a written motion seeking to modify the time limits on the cross-examination. She claimed that the rule was unfair because she carried the burden of proof. She also argued that defendants were purposefully limiting direct examination of their witnesses in order to limit her ability to demonstrate the fallacies of the witnesses' opinions. Butler requested a minimum of 2 hours for cross-examination of Drs. Bammel and Brown. On March 19, 1996, Butler filed a proffer of the cross-examination subjects she was prevented from raising with Dr. Brown because of time restraints.

The scope of both direct and cross-examination of a witness is subject to reasonable control by the trial court. The exercise of such control will not constitute reversible error absent a showing of abuse of discretion resulting in prejudice. *Kearney v. Kansas Public Service Co.*, 233 Kan. 492, 501, 665 P.2d 757 (1983); *Lemons v. St. John's Hospital of Salina*, 5 Kan. App. 2d 161, 164-65, 613 P.2d 957, *rev. denied* 228 Kan. 807 (1980).

A trial court's discretion in conducting the trial includes the scope, extent, and manner of the examination of the witnesses. "Because the court has a duty to move the testimony expeditiously along, limiting the time allowed for the examination of witnesses . . . [is a matter] necessarily confided to a trial judge." 75 Am. Jur. 2d, Trial § 328, pp. 539-40.

In this case, the court imposed the time limitations on cross-examination on February 28, 1996. At the time the matter was argued, the court noted that they had already gone longer than they had originally told the jury the case would take.

The rule was imposed after Butler complained about the length of time the defendants were taking in cross-examination. When the court announced the rule, Butler voiced no complaints that it was unfair to her in any manner. Instead, she waited until halfway through the defendants' case to complain that the cross-examination limitations were unfair to her.

The court's strict time limitations on cross-examination are troublesome, especially with respect to the expert witnesses. Generally, great latitude is given in the cross-examination of experts in order to permit the parties to adequately test their qualifications and knowledge, and the bases for their opinions. *Pope v. Ransdell*, 251 Kan. 112, 123, 833 P.2d 965 (1992). The record reflects that the direct examinations of Dr. Bammel and Dr. Brown were thorough, but efficiently, presented. Accordingly, Butler's time for cross-examination was probably not as lengthy as she would have liked.

The trial court based its decision, however, on the fact that Butler did not object to the rule when it was announced. Rather, she waited until after the end of her evidence; thus, the defendants were bound by this rule during the last 7 days of her case. The court apparently concluded that it was inequitable to allow Butler

to benefit from the rule and then object when it applied to her. The Supreme Court has recognized in other contexts that parties have to be bound by strategic decisions they make during the trial. "[I]nstead of voicing an objection to the split trial, the plaintiffs played cat and mouse, delaying their decision [about whether to agree to try liability and damages separately] until they could observe how the trial was progressing, and at a later point in time actually appearing to acquiesce in the split-trial procedure. They are now in no position to complain of a split trial, after engaging in 'wait and see' tactics." *Tilley v. International Harvester Co.*, 208 Kan. 75, 82, 490 P.2d 392 (1971).

While the court's limits on cross-examination border on the arbitrary, the court was in a dilemma. The parties were involved in a protracted case that had already far exceeded the time estimate given to the jury. The court structured a rule attempting to speed up the presentation of the evidence in an even-handed manner. Despite knowing the time limit would eventually apply to her, Butler appeared to acquiesce in the court's ruling during the remainder of her case. Whether the defendants expedited their evidence in order to limit Butler's cross-examination or to finally get the case to an already tired jury, or both, cannot be determined. Based upon all the circumstances, we find that the trial court did not abuse its discretion.

## Scope of Expert Testimony

Butler next argues that the trial court erred in permitting defendants to cross-examine her expert witnesses in a manner which called for them to speculate. She argues that defendants repeatedly placed unsubstantiated claims that something other than the defendants' negligence might have possibly caused her injuries. In making these arguments, Butler cites only to the defendants' cross-examination of Dr. Katherine Melhorn, her pediatric expert witness, and one page of the direct examination of Dr. Duke's expert witness, Dr. John Carey.

During Dr. Melhorn's cross-examination, defendants' attorneys questioned the witness about various tests that were performed and not performed on Butler that might explain her condition.

However, Butler's attorney only objected on grounds of speculation once during this cross-examination. The objection was made when Dr. Desjarlais' attorney was asking Dr. Melhorn about the tests that were not performed on Butler while in the hospital nursery. After this inquiry, counsel asked: "So when counsel for the plaintiff asked you about whether you had other explanations other than birth or trauma, we need to keep in consideration those other tests and those other things that were not investigated or were not done; right?" Butler's attorney objected, claiming the question was argumentative and called for speculation. The objection was overruled.

Butler's second citation to the record is a reference to the direct examination of Dr. Carey. In the direct examination, Dr. Carey admitted he had been asked to review the records and information regarding Butler's birth to evaluate whether Dr. Duke had comported with the standard of care for an obstetrician/gynecologist. Butler is apparently referencing a question where Dr. Carey was asked: "And, to the extent of your expertise, were you asked to evaluate and assess the possible cause of brain injury or the probable cause of brain injury to Amanda Butler?" The witness answered affirmatively. Butler's counsel, however, did not object to this question. Later in Dr. Carey's direct testimony, defense counsel specifically asked Dr. Carey to give only the opinions which he had reached within a reasonable degree of medical probability and to advise them if his opinions were only based on possibilities.

The admissibility of expert testimony is a matter within the broad discretion of the trial court. A trial court's ruling admitting such evidence will not be reversed absent an abuse of discretion. *Olathe Mfg., Inc. v. Browning Mfg.,* 259 Kan. 735, 762, 915 P.2d 86 (1996). A verdict cannot be set aside for the erroneous admission of evidence, however, unless the record reflects that a timely and specific objection was made to the evidence. K.S.A. 60-404; see *Miskew v. Hess,* 21 Kan. App. 2d 927, 934-35, 910 P.2d 223, *rev. denied* 259 Kan. 928 (1996). Moreover, a party may not object to evidence on one ground at trial and then assert a different objection on appeal. *Fitzpatrick v. Allen,* 24 Kan. App. 2d 896, 903, 955 P.2d 141, *rev. denied* 264 Kan. 821 (1998).

In claiming the defendants' examination of the experts was reversible error, Butler relies on *Tamplin v. Star Lumber & Supply Co.*, 251 Kan. 300, 836 P.2d 1102 (1992), and *Pope v. Ransdell*, 251 Kan. 112. Neither of these cases supports Butler's arguments and, in fact, both undermine her argument.

In *Tamplin*, the plaintiff claimed that injuries she sustained on the defendant's premises caused her to develop diabetes insipidus. At trial, the court permitted the plaintiff's expert to testify that it was a possibility that the plaintiff would not have a normal onset of puberty but limited the evidence to the issue of the mental anguish the plaintiff might suffer because of that possibility. The Supreme Court held that an injured person may claim emotional distress damages in these circumstances, even if the expert cannot testify to a degree of medical probability that the future medical problem will occur. 251 Kan. at 308. Because *Tamplin* deals with questions about emotional distress resulting from concerns for possible future medical conditions, it provides no support for plaintiff's claims.

Moreover, *Pope* completely undermines plaintiff's arguments. In *Pope*, the plaintiff appealed from an adverse verdict, claiming the district court improperly limited her cross-examination of the defendant's expert witnesses. Plaintiff had attempted to challenge the experts' testimony by asking questions regarding various possible causes; defendant's objections were sustained because the questions were not based on a reasonable degree of medical probability. The Supreme Court specifically held that the cross-examination of expert witnesses on possibilities was appropriate. 251 Kan. at 124. The court reasoned:

"The importance of cross-examination of an expert witness has been recognized in numerous decisions. . . . Great latitude is necessarily indulged in the cross-examination of an expert witness in order that the intelligence and powers of discernment of the witness, as well as capacity to form a correct judgment, may be submitted to the jury so it may have an opportunity for determining the value of his or her testimony. [Citation omitted.]" 251 Kan. at 123.

Butler also relies on *Sharples v. Roberts*, 249 Kan. 286, 816 P.2d 390 (1991). *Sharples* does not support the plaintiff's arguments. In *Sharples*, the Supreme Court upheld a summary judgment in favor of a health care provider because the plaintiff's expert did not testify that the defendant's negligent failure to diagnose plaintiff's condition, to any reasonable degree of medical probability, caused the plaintiff damages. At most, the expert testified that it was possible that plaintiff's complications could have been avoided if a timely diagnosis had been made. 249 Kan. at 296-97.

In this case, the cross-examination to which Butler objects merely questioned her experts about various possibilities about the cause of Butler's injuries other than negligence. The questions were well within the latitude allowed under *Pope*. In addition, Butler fails to cite to the record where any of the defendants' experts were allowed to express opinions on direct examination based on something other than a reasonable degree of medical probability. This issue is without merit.

## Motion to Set Aside Verdict

In her final issue, Butler contends that the trial court abused its discretion in not setting aside the jury's verdict on the grounds of passion and as being against the weight of the evidence. In this argument, she reasserts her arguments about juror misconduct. She also argues that defendants' experts agreed with her experts about the time in which the injury occurred and the fact that they had never seen a baby born with as much bruising around the head.

"When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of this court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal. [Citation omitted.]" *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 361-62, 837 P.2d 330 (1992).

This is a complex medical malpractice case involving the archetypical battle of the experts. Both sides presented experts testifying about negligence and causation; both sides effectively cross-ex-

amined the other's experts on these issues. Viewing the evidence in the light most favorable to the defendants, the verdict has a substantial basis in the record. Therefore, the trial court did not err in refusing to set aside the verdict as being against the weight of the evidence.

Affirmed.