No. 120,241

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DONNIE D. KING,
*Appellant*,

v.

CASEY'S GENERAL STORES, INC.,
*Appellee*.

SYLLABUS BY THE COURT

1.

The jury selection process allows the parties and the court an opportunity to ask questions about potential jurors' backgrounds, viewpoints, and proclivities in an effort to ensure the individuals who serve on the jury perform their role impartially and render a verdict based on the evidence presented.

2.

The jury selection process does not require or guarantee a jury of persons completely unfamiliar with a case. Instead, jury selection is an effort to empanel jurors who, regardless of background or acquaintance, can decide the case impartially—that is, jurors who can exercise deliberate and unbiased judgment.

3.

An appellate court reviews a district court's grant or denial of a motion for new trial for an abuse of discretion. An appellate court will not find that a district court abused its discretion in denying a motion for new trial based on allegations of juror misconduct unless the party asserting the error can show (1) the presence of juror misconduct and (2) that the misconduct substantially prejudiced his or her right to a fair trial.

1

4.

In most civil cases, the person asserting juror misconduct has the burden to prove both that misconduct occurred and that he or she was prejudiced by the problematic activity. When a juror provides a false answer to a material question during voir dire, however, a party need not separately prove that the conduct undermined the fairness of the trial. Instead, the juror's false answer itself is prejudicial, as it deprived the parties of the opportunity to question him or her further on that point, to seek to dismiss the juror for cause, or to remove the juror with a peremptory strike.

5.

A district court's discretion in ruling on a motion for a new trial is particularly important when there is conflicting evidence regarding juror misconduct. Appellate courts do not reweigh conflicting evidence and do not reassess jurors' credibility in responding to questions during voir dire.

6.

A district court's conclusion that a party failed to prove either juror misconduct or prejudice is a negative finding. An appellate court will only overturn a negative finding when the district court arbitrarily disregarded undisputed evidence or relied on some extrinsic consideration such as bias, passion, or prejudice to reach its decision.

7.

Juror misconduct must be based on more than the failure to volunteer information a potential juror speculates is important to counsel.

Appeal from Rice District Court; STEVEN E. JOHNSON, judge. Opinion filed October 11, 2019. Affirmed.

*Melinda G. Young*, of Bretz & Young, L.L.C., of Hutchinson, for appellant.

2

*Ronald J. Laskowski*, of The Law Office of Ronald J. Laskowski, of Topeka, for appellee.

Before ARNOLD-BURGER, C.J., BRUNS and WARNER, JJ.

WARNER, J.:  Donnie King sued Casey's General Stores, Inc., claiming he was injured when he slipped on the ice in a parking lot of a Casey's store. On the second day of trial, after the parties empaneled a jury and presented their opening arguments, King alleged one of the jurors had spoken about a settlement offer in the case with and in front of other potential jurors during voir dire. The district court and parties investigated the allegations, and the court found no misconduct. Nevertheless, the court removed the juror out of an abundance of caution and allowed the trial to proceed.

At the close of the trial, the jury found that King's injuries were not the fault of any party. King now appeals the district court's denial of his motion for a new trial based on the alleged juror misconduct. We affirm.

FACTUAL BACKGROUND
GIVING RISE TO KING'S ALLEGATIONS OF JUROR MISCONDUCT

King slipped on ice in the parking lot of a Casey's store in Lyons, Kansas. He subsequently filed a personal injury action against Casey's. The trial originally scheduled in the case was continued at the last minute for reasons not entirely clear from the record, though the record does reflect that the parties were exploring the possibility of a settlement at that time. The case did not settle, however, and proceeded to a jury trial two weeks later.

At the beginning of the jury selection process for the trial, the district court informed the jury pool that "[t]he whole purpose of [voir dire] is to find an impartial

3

jury." The court further explained that attorneys for both parties would ask the potential jurors questions "to find out if you have any reason that you might be partial in some way that would disqualify you from proceeding."

The parties commenced voir dire, with King asking the first questions. During Casey's portion of the examination, the district court excused a potential juror for cause and seated Juror J.W. on the jury panel. The parties then had the opportunity to ask J.W. questions about, among other things, his knowledge of and connection to the case.

Casey's counsel began this process by observing that J.W. had heard all the questions asked up to that point, and asked whether there was "anything that . . . would cause [J.W.] to have [a] problem with being on this jury." J.W. indicated that he knew one of the witnesses—an employee at Casey's—because the witness previously owned a bar J.W. would visit. The attorney then asked whether there was anything about J.W.'s acquaintance with the witness that "would cause [J.W.] to be unable to decide the issues in this case fairly." J.W. answered, "No, sir." Casey's counsel followed this line of questioning by asking, "Anything else jump out that would cause you a problem deciding this case impartially?" J.W. responded, "No."

When it was King's turn to examine J.W., his attorney's questions were limited to structural concerns—whether J.W. had strong opinions about lawyers or lawsuits and whether he would have difficulty awarding damages for pain and suffering. After a short exchange, King's counsel indicated that those were "all the questions" she had.

After both parties had the opportunity to examine J.W., the parties passed the panel—which then consisted of 21 potential jurors—for cause. The court released the potential jurors for a lunch break and admonished them not to discuss the case with anyone, instructing them not to "even drive by Casey's right now."

The parties subsequently exercised their peremptory challenges and selected a jury that included J.W. Another potential juror, R.M. (who had been very active in responding to voir dire examination by both parties), was removed after lunch by way of a peremptory strike. Although peremptory strikes do not require any rationale or explanation from the parties, the trial transcript reflects that King used a peremptory challenge to remove R.M. and that R.M. was the only juror who personally knew King's family.

Once jury selection was complete, the parties made their opening statements and began the presentation of evidence.

The next morning, before the jury was recalled to the courtroom, King's counsel informed the district court that R.M.—the excused juror—had contacted her law firm after he left the courthouse with information about jury selection. R.M. initially called the office and hung up before he was connected to any of the attorneys at the firm. But one of King's attorneys called him back at the number that appeared on the firm's caller ID. Another attorney recorded the conversation with R.M.—who was being broadcast by speaker phone—on her cell phone. The record is unclear whether R.M. was aware of this recording.

King played the recording for the court's consideration, and it was transcribed into the record. During the call, R.M. indicated that he had gone back and forth as to whether he should contact anyone but eventually decided to reach out to King's lawyers. R.M. then stated that one of the other potential jurors "was saying that Casey's had made this guy [King] an offer and he probably should have took it." R.M. explained that he decided to call the law firm because the person who made this comment "ended up being on the jury." R.M. indicated, "The more I got to thinking about that I was like is he saying that, no matter what, you don't think he should settle? I mean, I was like I don't know. I was just kind of confused."

5

King's attorney then asked R.M. if he understood the person to be saying that Casey's had made King an offer and that King should have taken it. R.M. replied, "Yeah, that's exactly what he said." R.M. stated that the person "said he even knew the dollar amount, but he wasn't going to tell us because we weren't supposed to talk about it." R.M. also thought that another person selected for the jury—Juror L.S.—had also overheard the conversation.

R.M. said the person who had spoken with him was "the very last guy that came up." R.M. noted that he "wouldn't have said anything" if the man "was excused," but R.M. was concerned since both the man and L.S. "ended up on the jury." R.M. indicated that he did not want to provide King's attorney with his own name because he "really [didn't] want to get like caught up in this." At the end of the conversation, he reiterated, "I honestly do not want to be involved" and "please keep me out of this."

King moved for a mistrial based on the information R.M. had provided. King did not call R.M. as a witness to answer further questions by the court or counsel but relied entirely on the recorded telephone call. King also indicated J.W. was the last juror called (and thus was the man R.M. referenced).

Casey's responded that it was "very suspicious about this entire phone call," especially since R.M. had been the only juror who knew King's family. Casey's was opposed to a mistrial because in Lyons, it would be difficult to find a jury entirely unfamiliar with the parties or the case. But although it did not believe there had been misconduct, Casey's indicated it was not opposed to removing J.W. from the jury. And Casey's reminded the court that the parties had previously agreed for other reasons that, if necessary, the trial could proceed with 11, not 12, jurors as long as at least 10 jurors agreed on the verdict.

The district court recalled J.W. for additional voir dire examination, reminding him of his oath. The court then explained that the parties "discovered . . . that nobody specifically asked if [J.W.] knew anything about this case in particular," so the court wanted to ask if he "had any information about this case that [he] had heard." J.W. responded that one of his coworkers had been called for the original trial that was continued and had told him that "somebody had fallen and that it was against Casey's, and that's all I know." J.W. stated he "didn't know any of the particulars or anything like that."

The court then asked if J.W. had mentioned this information to anyone at lunch. J.W. responded, "not at lunch," but he thought he "said something to somebody in the back row yesterday though that was sitting next to me." He could not remember who the person was, though he thought it was a man. He also stated that he did not know whether anyone else overheard him. When asked by the court whether he "talk[ed] about knowing anything outside of the case," J.W. responded that he "really didn't know anything outside of the case."

When the court finished its examination, the parties each had an opportunity to examine J.W. further. King's attorney asked whether J.W.'s coworker had told him what happened with the previously scheduled trial, and J.W. then recalled that his coworker had talked about a possible settlement discussion:

> "[King's counsel]: . . . [J.W.], do you—did anyone tell you why your coworker, who was part of the panel of jurors before, why that—did your coworker tell you how that—or what happened with that trial?
> "[J.W.]: No, he did not. I don't even know if he knew what happened at that trial. I mean, I have had two people, when I told them I had jury duty before I even knew what I was coming in here for, say that's probably a continuance of the case I was supposed to be on, but we do live in a very small community, so—but as far as with any of the details, no, I don't know anything, so . . .

7

"[King's counsel]: Your understanding was that it was—(interrupted)

"[J.W.]: Oh, wait. He did tell me that he thought that maybe Casey's offered—offered a settlement or something, and I don't know if it's true or not, but that's—he did say that."

Upon receiving this information, King's counsel confirmed J.W. had received this information from his coworker, asked for his coworker's name, and indicated those were the only questions she had.

Casey's counsel inquired further about the circumstances surrounding J.W.'s conversation with his coworker. J.W. explained the conversation occurred the week before the present trial, when J.W. learned he had been called for jury duty and the coworker surmised it may be the previously continued case. J.W. also explained that his conversation with the other potential juror the previous day had occurred before he was called to be on the panel. He stated he "didn't talk to anybody" once he was selected for the jury.

The trial court asked the bailiff to take J.W. back to the jury room and requested L.S. to be brought in for a few questions. The trial court explained to L.S. that they were trying to determine whether she had heard any information from another juror or potential juror about the case. L.S. said that she heard nothing and that she was by herself at lunch. Neither party had any question for L.S., and she returned to the jury room.

Following this investigation, the court reasoned—based on its observation of J.W. and L.S.— that it appeared "[t]he telephone call could be somebody speculating a great deal about the little tiny bits that they heard and taking it further." The court questioned whether R.M. "might be the one that's making assumptions based on the fact [J.W.] indicated . . . this case had been called before." And the court noted that the conversation between J.W. and R.M. occurred "possibly even . . . before they were put under oath," while all potential jurors were waiting in the gallery. The court ruled it did not believe

8

"based on the testimony here" and specifically J.W.'s answers that R.M.'s allegations in the phone call "tainted the jury." Thus, the court denied King's request for a mistrial.

Nevertheless, the court decided out of an abundance of caution to excuse J.W. from the jury:

> "I'm not sure that he's done anything wrong, but he obviously has some thoughts or predisposition here. Not that they're even to the point that I don't think that he could be rehabilitated with a simple question as to whether that would influence his decision after hearing the evidence and only deciding the case on what's presented here at trial. I still think it might be safer to ask him to be removed and continue with eleven. So I think we'll dismiss him from the jury."

The parties continued to present their evidence to the jury, which now included L.S. but not J.W. Following the close of the evidence, the judge instructed the jury on the law to be applied, and the parties gave their closing arguments. The jury returned a verdict finding no fault on the part of either party.

After the verdict, King moved for a new trial based on alleged jury misconduct, arguing that J.W.'s "false and/or incomplete answers on voir dire examination" entitled King to a new trial as a matter of law under *Kerby v. Hiesterman*, 162 Kan. 490, 497-98, 178 P.2d 194 (1947). The court denied King's motion. In its written journal entry, the court found that there was "no evidence of intentional juror misconduct." The court also found that although J.W. "admitted that he had discussions regarding an alleged prior settlement offer," those discussions "were not prejudicial" and there was "no evidence that [J.W.] tainted the jury by disclosing his prior discussions regarding the case." Finally, the court found there was "no evidence of misconduct," but "[e]ven if there was misconduct, any prejudice or harm was cured by [J.W.'s] removal from the jury prior to deliberations."

9

King appeals, arguing J.W.'s failure to inform the parties of the information he knew about the case during the initial voir dire constitutes juror misconduct and requires a new trial.

DISCUSSION

The jury "is a central foundation of our justice system and democracy." *Pena-Rodriguez v. Colorado*, 580 U.S. __, 137 S. Ct. 855, 860, 197 L. Ed. 2d 107 (2017). We rely on jurors to decide the case before them by applying the law to the facts, as determined by the evidence at trial. The jury selection process allows the parties and the court an opportunity to empanel jurors who understand that responsibility—to ask questions about potential jurors' backgrounds, viewpoints, and proclivities in an effort to ensure the individuals who serve on the jury perform their role impartially and render a verdict based on the evidence presented.

This process does not require or guarantee a jury of persons completely unfamiliar with a case. In many communities throughout Kansas, for example, it is difficult if not impossible to find jurors who are not acquainted with the parties or attorneys involved in a trial. *Logwood v. Martens*, 183 Kan. 534, 538-39, 331 P.2d 553 (1958). Instead, we seek jurors who, regardless of background or acquaintance, can decide the case *impartially*—that is, jurors who can "exercise . . . deliberate and unbiased judgment." *Mattox v. United States*, 146 U.S. 140, 149, 13 S. Ct. 50, 36 L. Ed. 917 (1892).

King argues that the initial inclusion of J.W. as part of the jury violated these principles, as J.W. knew at least some information about the case—including that a settlement offer had been made—that was not disclosed to the parties during the initial voir dire. King asserts J.W.'s failure to volunteer this information constituted juror misconduct, and the district court erred when it denied his motion for a new trial based on

10

this alleged concealment. Casey's counters that the district court did not abuse its discretion in denying the motion for new trial, asserting that King failed to provide credible evidence to support his allegation of juror misconduct.

1. *In a civil case, an appellate court reviews a district court's decision whether to grant a new trial based on juror misconduct for an abuse of discretion.*

An appellate court reviews a district court's grant or denial of a motion for new trial for an abuse of discretion. See K.S.A. 2018 Supp. 60-259(a); *Miller v. Johnson*, 295 Kan. 636, 684-85, 289 P.3d 1098 (2012). A court abuses its discretion (1) if no reasonable person would take the view it adopted; (2) if it commits a legal error; or (3) if its decision is based on factual findings unsupported by substantial competent evidence in the record. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). Kansas courts have held that a district court does not abuse its discretion in denying a motion for new trial based on allegations of juror misconduct unless the party asserting the error can show both the presence of juror misconduct and that the misconduct substantially prejudiced his or her right to a fair trial. *Butler v. HCA Health Svcs. of Kansas, Inc.*, 27 Kan. App. 2d 403, 408, 6 P.3d 871 (1999); see also *Stover v. Superior Industries Int'l, Inc.*, 29 Kan. App. 2d 235, 243, 29 P.3d 967 (2000) ("Appellate courts consistently adhere to the rule in both civil and criminal cases that juror misconduct is not a ground for a reversal, a new trial, or a mistrial unless it is shown to have substantially prejudiced a party's rights.").

In most civil cases, the person asserting juror misconduct has the burden to prove both that misconduct occurred and that he or she was prejudiced by the problematic activity. *Butler*, 27 Kan. App. 2d at 408. In rare instances, however, courts will presume prejudice has occurred. For example, when a juror provides a false answer to a material question during voir dire, parties need not separately prove the conduct undermined the fairness of the trial. Instead, the juror's false answer itself is prejudicial, as it deprived the

parties of the opportunity to question him or her further on that point, to seek to dismiss the juror for cause, or to remove the juror with a peremptory strike. See *Kerby*, 162 Kan. at 496-97. Cf. *Bell v. State*, 46 Kan. App. 2d 488, 494, 263 P.3d 840 (2011) (explaining that "when a juror intentionally deceives the court and the parties about an aspect of his or her background that is sufficiently material, prejudice is presumed and need not be separately proven").

King argues that we need not defer to the district court's findings or assessment of the evidence because the Kansas Supreme Court in *Kerby* described a juror's provision of false information during voir dire as an "exception" to the rule recognizing a district court's discretion in considering whether to grant a new trial based on juror misconduct. 162 Kan. at 496. Instead, King asserts, appellate courts have unlimited review of the district court's ruling since an allegation of a juror's deception calls into question the fairness of the proceedings as a whole.

A closer review of *Kerby*, however, demonstrates that the exception to the abuse-of-discretion review discussed there occurred where the parties "*admitted in substance that a juror gave a false answer on voir dire examination concerning his qualifications to serve.*" (Emphasis added.) 162 Kan. at 496. Thus, contrary to King's arguments on appeal, this "exception" is not so much based on the alleged falsity of a juror's response, but on the well-established principle that appellate courts exercise unlimited review when the facts are stipulated or otherwise undisputed. This is because appellate courts in such circumstances are in as good a position as the district court to evaluate the facts in light of the governing law. See *Bell*, 46 Kan. App. 2d at 492; see also *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 964, 298 P.3d 250 (2013) (fact questions may be resolved by the appellate court de novo when the relevant facts before the district court were undisputed); *Nuessen v. Sutherlands*, 51 Kan. App. 2d 616, 618, 352 P.3d 587 (2015) (appellate court's review is unlimited when considering whether a court or administrative agency erroneously applies the law to undisputed facts).

12

But where there is "a conflict of evidence upon the possible misconduct," Kansas caselaw recognizes the importance of the district court's discretion in considering whether to grant a new trial. *Kerby*, 162 Kan. at 496. After all, appellate court judges are not present to hear a juror's answers to voir dire examination. We do not reweigh conflicting evidence and do not reassess jurors' credibility in responding to questions. Accord *LSF Franchise REO I v. Emporia Restaurants, Inc.*, 283 Kan. 13, 19, 152 P.3d 34 (2007). And we similarly give substantial deference to a district court's conclusion that a party failed to prove either misconduct or prejudice. See *Cresto v. Cresto*, 302 Kan. 820, 845, 358 P.3d 831 (2015) (negative findings only overturned when the district court arbitrarily disregards undisputed evidence or relies upon some extrinsic consideration such as bias, passion, or prejudice to reach its decision).

The district court here was faced with conflicting versions of what J.W. knew and when and with whom he discussed that information. The court was present for and participated in the voir dire examination—both the initial voir dire and on the morning of the second day of trial. The court listened to the recording of the conversation between R.M. and King's counsel, heard the inflection in R.M.'s voice, and balanced his credibility against the sworn responses of J.W. and L.S. In these circumstances, the question before us is whether the district court's factual findings are supported by substantial competent evidence and whether its conclusion that King failed to prove prejudicial juror misconduct is reasonable in light of the record as a whole.

2. *The district court did not abuse its discretion in denying King's motion for a new trial. The court's determination that King failed to demonstrate juror misconduct is reasonable and supported by the record.*

On appeal, King argues that the district court erred in concluding there was no evidence of juror misconduct since J.W. had information about the case, talked about that

13

information with another potential juror, and did not disclose that information during voir dire. King does not attempt to demonstrate prejudice from J.W.'s initial inclusion as part of the jury. Instead, he argues that J.W.'s failure to affirmatively bring the information he knew about the case to the parties' attention during initial voir dire is akin to providing a false response to a question, and thus prejudice should be presumed. Such conduct, King asserts, required the district court as a matter of law to grant him a new trial.

We disagree. It is true that Kansas appellate courts have reversed the denial of a new trial when the facts demonstrate a juror intentionally gave false answers to material questions during voir dire. See *State v. Jenkins*, 269 Kan. 334, 338-39, 2 P.3d 769 (2000); *Kerby*, 162 Kan. at 496; *Bell*, 46 Kan. App. 2d at 494. But the parties in those cases did not dispute that a juror had provided false information. Here, the court was confronted with conflicting versions of the circumstances under which J.W. discussed the previous case with potential jurors and the content of those discussions. After listening to the recording, participating in the examination of J.W. and L.S. (as well as the entire first day of voir dire), and hearing the parties' arguments, the district court ruled King had not proved that any juror misconduct occurred. This negative finding that King failed to meet his burden of proof is reasonable and supported by the record.

During the initial voir dire, neither party asked J.W. whether he had information regarding the case or the previous trial setting. When he joined the panel of potential jurors, J.W. volunteered that he knew one of the witnesses, a Casey's employee, but that his acquaintance would not prevent him from deciding the case fairly and impartially. He indicated he did not have a belief about lawsuits, lawyers, or damages that would stand in his way of deciding the case fairly. There is no evidence that J.W. answered any question falsely or provided an incomplete response.

King argues that J.W.'s failure to inform the court and the parties that he had heard there may have been a settlement offer in the case amounted to willful deception by

14

omission. King notes that J.W. did not offer this information during initial voir dire and did not provide information regarding the settlement offer during the court's questions on the second day of trial. Instead, J.W. only brought up settlement during the questions by King's counsel—after the court's line of questions had concluded but before Casey's attorney had the opportunity to examine him.

But juror misconduct "'must be based on more than the failure to volunteer information a potential juror speculates or surmises is important to counsel.'" *State v. Hirsh*, 310 Kan. 321, 345, 446 P.3d 472, 490 (2019) (quoting *State v. Hopkins*, 257 Kan. 723, Syl. ¶ 4, 896 P.2d 373 [1995]). Indeed, our Kansas Supreme Court has recently emphasized that jurors are not required to exercise clairvoyance during voir dire. See *Hirsh*, 310 Kan. at 344, 446 P.3d at 489 (finding there was "no actual deceit and no apparent intention to deceive" when "[n]either counsel asked" the jurors about the information they now were claiming they should have provided).

No one asked J.W. whether he had been told anything about the previous trial during the first day. In fact, the only broad, catch-all question asked of J.W. during the initial voir dire came from Casey's counsel: "Anything else jump out that would cause you a problem deciding this case impartially?" J.W. answered, "No." Although he did not volunteer that he had any other information about the case at that time, that was not what he had been asked. Instead, he was asked *whether anything would prevent him from being impartial*. As the district court indicated from the bench, the mere knowledge that there have been settlement discussions in a case does not necessarily indicate that a person cannot hear the evidence and fairly decide the case.

On the second day of trial when J.W. was recalled and asked specifically whether he had heard anything about the underlying case, he answered the court's and counsels' questions. Just as he previously volunteered during the initial voir dire that he knew one of the witnesses, he similarly indicated that he had heard there may have been a

15

settlement offer that continued the original trial date, though he did not "know if it's true or not." Although he did not mention the settlement at the very beginning of the questioning, he nevertheless disclosed this information to the parties and court. The record supports the district court's conclusion that this is *not* a case where a juror has deprived the parties and the court of relevant information by intentionally providing false answers during voir dire.

It is true that R.M.'s recollection of his conversation with J.W.—provided in the unsworn telephone recording—conflicted with some of J.W.'s responses. But the existence of conflicting evidence regarding jurors' activities does not automatically call into question the district court's rulings. Instead, it is in these circumstances that we defer to the district court's discretion and factual findings as long as the court's decision is reasonable and supported by evidence in the record. See *Kerby*, 162 Kan. at 496.

The district court participated in voir dire, asked J.W. and L.S. questions, and heard the jurors' responses to those questions and the questions of counsel. The court personally observed their demeanor and assessed their credibility. It is apparent from the district court's denial of the motion for a mistrial and its findings in its subsequent denial of the motion for a new trial that the court found J.W.'s explanation to be more credible than the unsworn, recorded conversation between R.M. and King's attorney. See *State v. Longoria*, 301 Kan. 489, 531, 343 P.3d 1128 (2015) ("After an inquiry has been made" into a juror's actions by reopening voir dire, "an appellate court gives a high degree of deference to the trial court's findings concerning the credibility of witnesses and the perceived impact of the allegedly prejudicial event."). In short, the district court's findings that J.W.'s actions did not constitute juror misconduct and did not affect the jury's subsequent deliberations are supported by substantial competent evidence in the record.

Moreover, even though the district court did not believe J.W.'s actions constituted misconduct, the court removed J.W. from the jury out of an abundance of caution while

16

the case was ongoing. Thus, J.W. did not participate in juror deliberations and played no part in reaching the jury's verdict. This case is therefore fundamentally different from *Kerby*, *Jenkins*, or *Bell*, where a juror's problematic responses during voir dire only came to light after a verdict had been rendered—that is, after the juror in question participated in deciding the outcome. In such cases, the only recourse was to allow a new trial. But the district court here found that even if King had demonstrated that J.W.'s actions constituted misconduct, any perceived prejudice was cured when the court removed J.W. from the jury before deliberations. Cf. *Warger v. Shauers*, 574 U.S. 40, 51, 135 S. Ct. 521, 190 L. Ed. 2d 422 (2014) (even when a juror conceals information in voir dire, "juror impartiality is adequately assured by the parties' ability to bring to the court's attention any evidence of bias before the verdict is rendered").

King offers no evidence on appeal to show that J.W.'s initial inclusion on the panel but removal during the evidentiary phase of trial affected the jury's deliberations. Indeed, the circumstances surrounding the voir dire in this case demonstrate why, in most circumstances, courts require a person seeking a new trial on the basis of juror misconduct to establish prejudice. The district court found King had not made this showing, and we see no reason to set aside the court's assessment. Accord *Cresto*, 302 Kan. at 845.

The district court's conclusion that there was no juror misconduct in this case is reasonable and supported by substantial competent evidence in the record. In the absence of juror misconduct, the court did not err in denying King's motion for a new trial.

Affirmed.

17